**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION**

| | | |
|---|---|---|
| ENVIRO TECH CHEMICAL SERVICES, INC., | § § § | |
| *Plaintiff*, | § § | Civil Action No. 4:21-cv-000601-BRW |
| v. | § § | Jury Trial Demanded |
| SAFE FOODS CORPORATION, | § § | |
| *Defendant.* | § | |

**<ins>DEFENDANT SAFE FOODS CORPORATION'S
OPENING CLAIM CONSTRUCTION BRIEF</ins>**

# TABLES OF CONTENT

I.      INTRODUCTION ............................................................................................... 1

II.     RELEVANT LEGAL STANDARDS FOR CLAIM CONSTRUCTION .......................... 3

III.    THE THREE TERMS REQUIRING CONSTRUCTION.................................................. 7

    A.   "determining the pH" (Claims 1, 5, 9, 10, 14, 18, 19, 21, 23, 24, 26, 28, 29, 31, 33) ................................................................................................................. 7

    B.   "altering the pH of the peracetic acid-containing water" or "altering the pH" (Claims 1, 6, 9, 10, 15, 18, 19, 22, 23, 24, 27, 28, 29, 32, 33)................................ 13

    C.   "after the step of…[b], [c], [d], [e]" (Claims 1, 10, 19, 24, 29) ............................ 18

IV.     RELEVANT LEGAL STANDARDS FOR INDEFINITENESS..................................... 23

V.      THE TERMS "ABOUT" AND "ANTIMICROBIAL AMOUNT" ARE INDEFINITE . 24

    A.   "about" (with reference to pH) (Claims 1, 10, 19, 24, 29)...................................... 25

        1.   Meaning Based Upon the Claims of the '321 Patent ....................................... 28

        2.   Meaning Based Upon the Specification of the '321 Patent............................. 28

        3.   Meaning Based Upon the Prosecution History of the '321 Patent.................. 29

            a.   Enviro Tech's prosecution arguments dictating that "about" means a pH of less than 0.3................................................................................................... 30

            b.   Enviro Tech's prosecution arguments dictating that "about" means a pH of 0.3................................................................................................................. 31

            c.   Enviro Tech's prosecution arguments dictating that "about" means "0.0" or "exactly"....................................................................................................... 31

        4.   "About" is indefinite because any other conclusion would allow Enviro Tech to improperly recapture scope that was surrendered during prosecution ............ 33

    B.   "antimicrobial amount" (Claims 1, 2, 3, 10, 11, 12, 19, 24, 29)............................ 34

        1.   Meaning Based Upon the Claims of the '321 Patent ....................................... 36

        2.   Meaning Based Upon the Specification of the '321 Patent............................. 38

        3.   Meaning Based Upon the Prosecution History of the '321 Patent.................. 42

            a.   Enviro Tech's prosecution arguments regarding Kurschner '676 .............. 42

            b.   Enviro Tech's prosecution arguments regarding Hilgren '790.................... 45

            c.   Other Subjective Considerations................................................................. 46

VI.     CONCLUSION.................................................................................................... 55

i

# **TABLE OF AUTHORITIES**

**Cases**

*Am. Piledriving Equip., Inc. v. Geoquip, Inc.*,
  637 F.3d 1324 (Fed. Cir. 2011) .......................................................................... 6, 23

*Amgen, Inc. v. Chugai Pharm. Co., Ltd.*,
  927 F.2d 1200 (Fed. Cir. 1991) .................................................................. 26, 33, 34

*Andersen Corp. v. Fiber Composites, LLC*,
  474 F.3d 1361 (Fed. Cir. 2007) ................................................................................ 11

*ArcelorMittal France v. AK Steel Corp.*,
  700 F.3d 1314 (Fed. Cir. 2012) ................................................................................. 5

*Aventis Pharms., Inc. v. Amino Chems. Ltd.*,
  715 F.3d 1363 (Fed. Cir. 2013) ................................................................................. 5

*Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*,
  262 F.3d 1258 (Fed. Cir. 2001) ................................................................................. 4

*C.R. Bard, Inc. v. U.S. Surgical Corp.*,
  388 F.3d 858 (Fed. Cir. 2004) .................................................................................. 4

*Datamize, LLC v. Plumtree Software, Inc.*,
  417 F.3d 1342 (Fed. Cir. 2005) ............................................................................... 24

*Elkay Mfg. Co. v. Ebco Mfg. Co.*,
  192 F.3d 973 (Fed. Cir. 1999) ................................................................................. 21

*Fenner Invs., Ltd. v. Cellco P'ship*,
  778 F.3d 1320 (Fed. Cir. 2015) ............................................................................... 10

*GPNE Corp. v. Apple Inc.*,
  830 F.3d 1365 (Fed. Cir. 2016) ............................................................................... 15

*In re Benno*,
  768 F.2d 1340 (Fed. Cir. 1985) ................................................................................. 4

*Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*,
  381 F.3d 1111 (Fed. Cir. 2004) ............................................................................. 3, 4

*Interactive Gift Express, Inc. v. Compuserve Inc.*,
  256 F.3d 1323 (Fed. Cir. 2001) ............................................................................... 18

*Kalman v. Kimberly-Clark Corp.*,
  713 F.2d 760 (Fed. Cir. 1984) ................................................................................. 37

*Karlin Tech., Inc. v. Surgical Dynamics, Inc.*,
  177 F.3d 968 (Fed.Cir.1999) ................................................................................... 37

ii

*Loral Fairchild Corp. v. Sony Corp.*,
    181 F.3d 1313 (Fed. Cir. 1999) ................................................................................ 23

*Markman v. Westview Instr., Inc.*,
    517 U.S. 370 (1996) ......................................................................................................... 3

*Microsoft Corp. v. Multi-Tech Sys., Inc.*,
    357 F.3d 1340 (Fed. Cir. 2004) ................................................................................ 17

*Morton Int'l, Inc. v. Cardinal Chem. Co.*,
    5 F.3d 1464 (Fed.Cir.1993) ....................................................................................... 24

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
    572 U.S. 898 (2014) ............................................................................................... 24, 34

*Nazomi Commc'ns, Inc. v. Arm Holdings, PLC.*,
    403 F.3d 1364 (Fed.Cir.2005) ................................................................................. 37

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*,
    521 F.3d 1351 (Fed. Cir. 2008) ............................................................................. 6, 7

*Omega Eng'g, Inc. v. Raytek Corp.*,
    334 F.3d 1314 (Fed. Cir. 2003) ........................................................... 6, 10, 12, 23

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ................................................................................ 14

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) (en banc) ......................................................... 3, 4, 5

*Playtex Products, Inc. v. Procter & Gamble Co.*,
    400 F.3d 901 (Fed. Cir. 2005) ............................................................................... 4, 5

*Praxair, Inc. v. ATMI, Inc.*,
    543 F.3d 1306 (Fed. Cir. 2008) ................................................................................ 23

*Renishaw PLC v. Marposs Societa Per Azioni*,
    158 F.3d 1243 (Fed. Cir. 1998) .................................................................................. 5

*Retractable Techs., Inc. v. Becton, Dickinson & Co.*,
    653 F.3d 1296 (Fed. Cir. 2011) ................................................................................ 10

*Return Mail, Inc. v. US Postal Service*,
    139 S. Ct. 1853 (2019) .................................................................................................. 4

*SpeedTrack, Inc. v. Amazon.com*,
    998 F.3d 1373 (Fed. Cir. 2021) ................................................................................ 11

*Standard Oil Co. v. American Cyanamid Co.*,
    774 F.2d 448 (Fed. Cir. 1985) .................................................................................. 34

*Synthes (USA) v. Smith & Nephew, Inc.*,
    No. 03-cv-0084, 2008 WL 343114 (E.D. Pa. Feb. 4, 2008) .................................... 27

*Tempo Lighting, Inc. v. Tivoli, LLC*,
    742 F.3d 973 (Fed. Cir. 2014) ................................................................ 19

*TorPharm, Inc v. Ranbaxy Pharmas, Inc.*,
    336 F.3d 1322 (Fed. Cir. 2003) .............................................................. 21

*Vitronics Corp. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996) .................................................................. 5

**Statutes**

35 U.S.C. § 112 ................................................................................. 4, 24, 37

35 U.S.C. § 132(a) ...................................................................................... 4

**Other Authorities**

37 C.F.R § 1.121(g) .................................................................................. 19

## I.     INTRODUCTION

On July 2, 2021, Plaintiff Enviro Tech Chemical Services, Inc. ("Enviro Tech" or "Plaintiff") sued Defendant Safe Foods Corporation ("Safe Foods" or "Defendant") for patent infringement arising from Safe Foods' provision of antimicrobial intervention programs used in poultry processing.

The asserted patent—U.S. Patent No. 10,912,321 ("the '321 Patent" or "Asserted Patent"), Exhibit A—is directed toward a method for treatment of poultry carcasses using peracetic acid. Peracetic acid (also referred to as "PAA") is used as a disinfectant in the food industry. The claims of the '321 Patent recite methods for treating at least a portion of poultry carcass. There are five independent claims, claims 1, 10, 19, 24, and 29. Claim 1 is provided here as example, with the designation of the steps, [pre], [a], [b], [c], [d], and [e], being provided for ease of future reference.

| Claim Element | Claim Language |
|:---:|:---|
| [pre] | A method of treating at least a portion of a poultry carcass with peracetic acid, said method comprising the steps of: |
| [a] | providing, in a reservoir, a peracetic acid-containing water, wherein the peracetic acid-containing water comprises water and an antimicrobial amount of a solution of peracetic acid; |
| [b] | after the step of providing the peracetic acid-containing water, determining the pH of the peracetic acid-containing water, and altering the pH of the peracetic acid-containing water to a pH of about 7.6 to about 10 by adding an alkaline source; |
| [c] | after the step of determining the pH and altering the pH of the peracetic acid-containing water, placing into the peracetic acid-containing water at least a portion of a poultry carcass; |

| [d] | after the step of placing at least the portion of the poultry carcass into the peracetic acid-containing water, determining the pH of the peracetic acid-containing water in the reservoir with at least the portion of the poultry carcass therein, and altering the pH of the peracetic acid-containing water to a pH of about 7.6 to about 10 by adding an alkaline source; and |
|---|---|
| [e] | after the step of determining the pH and altering the pH of the peracetic acid-containing water having at least the portion of the poultry carcass therein, removing at least the portion of the poultry carcass from the peracetic acid-containing water. |

Ex. A, '321 Patent, 61:31-58 (claim 1). Each of the five independent claims are identical with the exception of the claimed pH ranges recited in steps [b] and [d].[1] Thus, each of the five independent claims generally require steps of providing a peracetic acid-containing water, determining the pH of that water and altering the pH to reach a claimed range, placing at least a portion of a poultry carcass into the water, again determining the pH of the water after a chicken carcass is placed into the water and altering the pH of the water that contains a portion of a poultry carcass to reach a claimed range, and removing the poultry carcass. During the course of '321 Patent's 9.5-year examination before the U.S. Patent & Trademark Office ("PTO" or "Patent Office"), Enviro Tech made several limiting arguments regarding the scope of the claims in attempts to differentiate the claims from prior art and otherwise gain allowance of the patent.

Enviro Tech has asserted infringement of claims 1-3, 5-12, 14-19, 21-24, 26-29, and 31-33 ("the Asserted Claims") of the'321 Patent. In connection with the Asserted Claims, the parties have identified five (5) terms from the '321 Patent that require this Court's consideration during

---

[1] In the five independent claims, the pH ranges recited in steps [b] and [d] are as follows: "about 7.6 to about 10" (claim 1), "about 7.6 to about 9.3" (claim 10), "about 7.6 to about 9" (claim 19), "about 8 to about 9" (claim 24), and "about 9 to about 10" (claim 29).

the claim construction process. For three (3) of these terms, Safe Foods proposes constructions that take into account the disclosure of the specification and arguments made by Enviro Tech during prosecution to obtain allowance of the '321 Patent, including arguments made to distinguish its claimed methods from the prior art. The remaining two (2) terms do not provide a person of ordinary skill in the art with adequate notice of their claim scope and are therefore indefinite, rendering claims containing the terms also indefinite and invalid.[2]

In contrast, Plaintiff seeks a "plain an ordinary meaning" construction of every identified term (including the indefinite terms), improperly seeking to distance itself from statements it made to the Patent Office to overcome prior art and otherwise obtain allowance of the '321 Patent. As set forth in more detail below, because Safe Foods' proposed constructions and positions are consistent with the intrinsic and extrinsic record—and Plaintiff's proposed constructions are not— Safe Foods respectfully submits that the Court should adopt its proposed constructions and indefiniteness positions.

## II.  RELEVANT LEGAL STANDARDS FOR CLAIM CONSTRUCTION

It is well-settled that the interpretation of the claims of a patent, i.e., claim construction, is a matter of law. *Markman v. Westview Instr., Inc.*, 517 U.S. 370, 384 (1996). Claim construction begins with the words of the claim itself. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) ("It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude,'" quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)).

---

[2]    The relevant legal standard for claim construction and arguments for the three terms to be construed are addressed in Sections II and III, respectively. The relevant legal standard and the analysis of the two terms Safe Foods asserts are indefinite are addressed in Sections IV and V, respectively.

Beyond the words of the claims, Courts may further examine both the patent's intrinsic and extrinsic evidence to define the claims' proper scope. *See id*. at 1312; *C.R. Bard, Inc. v. U.S. Surgical Corp*., 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). Intrinsic evidence includes the patent claims, the patent's specification, and its prosecution history. *See Phillips*, 415 F.3d at 1314; *C.R. Bard, Inc.*, 388 F.3d at 861. The "specification" refers to the text and figures in the four-corners of a patent itself that explain and give context to the claims, although technically the claims are also part of the specification. *In re Benno*, 768 F.2d 1340, 1346 (Fed. Cir. 1985) (". . . claims being technically part of the 'specification'") (citing 35 U.S.C. § 112, ¶ 2); *see also* 35 U.S.C. § 112, ¶ 2 ("The specification shall conclude with one or more claims.") (emphasis added); *see also Playtex Products, Inc. v. Procter & Gamble Co.*, 400 F.3d 901, 909 (Fed. Cir. 2005) ("The specification includes the drawings."). The prosecution history (sometimes referred to as the "file wrapper" or "file history") is a record of the communications between the patent applicant and the examiner, a Patent Office employee who reviews the applicant's patent claims in light of the prior art and decides whether the claims meet the applicable patent law requirements. *See Return Mail, Inc. v. US Postal Service*, 139 S. Ct. 1853, 1859 (2019). The prosecution history contains the reasons the examiner accepts or rejects a claim which are put forth in "office actions," *see* 35 U.S.C. § 132(a), and amendments to the claims and/or arguments made by the applicant in response to the examiner's rejections.

Extrinsic evidence refers to any evidence that is not part of the patent or its prosecution history, including technical dictionaries, treatises, prior art, or expert testimony that may help a court understand the underlying technology and the manner in which one skilled in the art might understand the claim terms. Although extrinsic evidence can play a role in the claim construction

process, it "may not be 'used to contradict claim meaning that is unambiguous in light of the intrinsic evidence.'" *ArcelorMittal France v. AK Steel Corp.*, 700 F.3d 1314, 1320 (Fed. Cir. 2012) (quotations omitted); *see also Playtex Prods., Inc. v. Procter & Gamble Co.*, 400 F.3d 901, 907-08 (Fed. Cir. 2005). When defining a general usage term, as opposed to a specialized term of art, courts often turn to ordinary dictionary definitions for guidance. *See, e.g.*, *Renishaw PLC v. Marposs Societa Per Azioni*, 158 F.3d 1243, 1249 (Fed. Cir. 1998) (consulting dictionary definitions of "when" because "[n]either party forwards a technical meaning for 'when' in the applicable industry"). However, words may have multiple meanings depending on context, and where multiple definitions of a common term exist, the court should consider the context of the term within the claims. *Id.* (rejecting one dictionary definition of "when" as inconsistent with the term's use in the claims).

Claims "must be construed in light of the appropriate context in which the claim term is used." *Aventis Pharms., Inc. v. Amino Chems. Ltd.*, 715 F.3d 1363, 1373 (Fed. Cir. 2013). However, a patentee may define his own terms, give a claim term a different meaning, or disclaim or disavow the claim scope. *Phillips*, 415 F.3d at 1316. In these situations, the inventor's lexicography governs. *Id*. at 1316. In the context of claim construction, "ordinary and customary" means how a person of skill in the art at the time of the invention would have understood the term as it is used in the claim. *Phillips*, 415 F.3d at 1313. When necessary to construe a claim, intrinsic evidence is typically "the single best guide to the meaning of a disputed term." *Phillips*, 413 F.3d at 1315 (*citing Vitronics Corp. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). Of course, the claims are "read in view of the specification, of which they are a part." *Phillips*, 413 F.3d at 1315.

Additionally, during prosecution, an applicant may disclaim claim scope to differentiate the claims from prior art identified by the patent examiner. *See, e.g.*, *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324–25 (Fed. Cir. 2003) (explaining that "the prosecution history (or file wrapper) limits the interpretation of claims so as to exclude any interpretation that may have been disclaimed or disavowed during prosecution in order to obtain claim allowance . . . [because] [a]s a basic principle of claim interpretation, prosecution disclaimer promotes the public notice function of the intrinsic evidence and protects the public's reliance on definitive statements made during prosecution.") (internal quotes and citations omitted). Therefore, if the applicant states that the claims should have a specific meaning during prosecution, the doctrine of prosecution disclaimer "preclude[s] patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution." *Id.* 1323. Even if the applicant attempted to distinguish the claims from the cited prior art on multiple grounds, any argument "serve[s] as a disclaimer of claim scope even if the applicant distinguishes the reference on other grounds as well." *Am. Piledriving Equip., Inc. v. Geoquip, Inc.*, 637 F.3d 1324, 1336 (Fed. Cir. 2011) (citation omitted). This disclaimer is also effective "regardless of whether the examiner agreed" with the applicant because any of the patentee's "statements … inform the proper construction of the term[s]." *Id.* (citation omitted). Once a patentee unambiguously argues that the claims have a certain meaning or should be afforded a specific interpretation, the patentee "cannot attempt to distance itself from the disavowal of broader claim scope." *Id.*

Finally, while "[d]istrict courts are not (and should not be) required to construe *every* limitation present in a patent's asserted claims," when "the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1362-63 (Fed. Cir. 2008) (emphasis original).

As such, a "determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute." *Id.* at 1361.

## III.    THE THREE TERMS REQUIRING CONSTRUCTION

The parties have identified three (3) terms from the '321 Patent that are in dispute for which construction by the Court is sought. Safe Foods addresses each, in turn, below.

### A.  "determining the pH" (Claims 1, 5, 9, 10, 14, 18, 19, 21, 23, 24, 26, 28, 29, 31, 33)

| Term | Defendant's Proposed Construction | Plaintiff's Proposed Construction |
|------|-----------------------------------|-----------------------------------|
| "determining the pH" | measuring the pH | Plain and ordinary meaning |

The pH of a solution is a measure of the acidity or alkalinity of the solution (i.e., whether it is acidic or basic). Ex. D, Declaration of Edward W. Mills, Ph.D. ("Dr. Mills Decl."), ¶ 54. Although the pH of a solution containing a known amount of acid or base and a known amount of water can be theoretically calculated by knowing the amount of water, acid, and alkali added, such a calculation will only produce a result as accurate as the initial measurements for these components. Ex. D, Dr. Mills Decl., ¶ 56. In other words, the result of the calculation is what the pH *should* be theoretically, and not its actual pH, which can only be determined by an actual pH measurement, which accounts for real-world conditions. Ex. D, Dr. Mills Decl., ¶¶ 55-56. Indeed, the pH of a solution almost always deviates from its theoretical, calculated value for a host of reasons, including measurement variability in the amounts of water and acid/alkali, impurities present in the water or acid/alkali solution, or the introduction of unknown quantities of other ingredients (such as poultry carcasses). Ex. D, Dr. Mills Decl., ¶¶ 55-56. Simply put, to accurately determine the pH of a solution, it must be actually *measured*. Ex. D, Dr. Mills Decl., ¶ 56. Common

methods for measuring pH include glass electrodes, indicator solutions, and pH test strips. Ex. D, Dr. Mills Decl., ¶ 56.

The claims of the '321 Patent recognize this practicality by claiming a process that requires that the pH be controlled—not merely estimated—by "altering the pH" after it is first ***determined***. Indeed, this altering or "adjustment" of the pH is the crux of the invention, as confirmed by Enviro Tech's statements during prosecution: "[t]he nature of Applicants' invention is a method for treating poultry during processing by ***adjusting*** the pH of the water containing a peracetic acid biocide." Ex. B9, Reply to Office Action, January 15, 2016, 4. Moreover, this alleged invention also requires two separate steps where the pH is determined. First, before a portion of a poultry carcass is placed in the peracetic acid-containing water:

> after the step of providing the peracetic acid-containing water,. determining the pH of the peracetic acid-containing water, and altering the pH of the peracetic acid-containing water to a pH of about 7.6 to about 10 by adding an alkaline source;

Ex. A, '321 Patent, 61:38-42. And second:

> after the step of placing at least the portion of the poultry carcass into the peracetic acid-containing water, determining the pH of the peracetic acid-containing water in the reservoir with at least the portion of the poultry carcass therein, and altering the pH of the peracetic acid-containing water to a pH of about 7.6 to about 10 by adding an alkaline source; and

Ex. A, '321 Patent, 61:47-53.[3]

While "determining" may appear to be a common term, its use in the claims, specification and prosecution history of the '321 Patent confirms a specific meaning, i.e., that "determining the pH" means that the pH is **measured**. In the first step, the **actual** pH of the "peracetic acid-containing water" is **measured** so that it can be **determined** prior to "altering the pH of the peracetic acid-containing water to a pH of about 7.6 to about 10 by adding an alkaline source." Ex. A, '321 Patent, 61:38-42. The second, "determining step," also requires the pH to be measured and provides further confirmation that the only way the pH can be "determined" is for it to be physically measured. Specifically, the pH is determined "after the step of placing at least the portion of the poultry carcass into the peracetic acid-containing water." Ex. A, '321 Patent, 61:47-53. The addition of even a portion of a poultry carcass to the water necessarily alters the pH. Ex. D, Dr. Mills Decl., ¶¶ 55-56; *see also* Ex. B7, Declaration of Jonathan N. Howarth, July 10, 2015, ¶ 5. As such, the only way to determine the pH after addition of "at least a portion of the poultry carcass into the peracetic acid-containing water" is to actually measure the pH because there is no way to know, with sufficient certainty, how much any particular chicken carcass will change the pH of the solution. Ex. D, Dr. Mills Decl., ¶¶ 55-56.

During prosecution, Enviro Tech explicitly conceded that measurement of the pH was required by the claims to overcome the Examiner's argument that adjusting the pH to the claimed pH ranges would be obvious in light of a prior art reference that disclosed different pH ranges used in the treatment of chicken carcasses:

---

[3]    The citation for these claim steps is to claim 1 of the '321 Patent. However, all of the five independent claims of the '321 Patent, claims 1, 10, 19, 24, and 29, are identical with the exception of the pH ranges claimed in the two steps, [b] and [d]. Each of the five independent claims recite different pH ranges in these two steps.

> required. (*Id.*) As Dr. Bilgili explains, a typical large poultry processing plant processes over one million broiler chickens per week, and uses almost 200,000 gallons of water containing peracetic acid in the chill tanks each day. Any adjustment of the pH of this volume of water would require significant changes in chemistry, including the use of very large amounts of an alkaline source chemical, such as sodium hydroxide; <mark>additional equipment to measure and monitor the pH</mark>; additional equipment to deliver the alkaline source; and increased manpower to implement the change in chemistry and to constantly monitor the pH adjustment process. (*Id.*) Such a change would significantly increase costs, both initially in setting up the new equipment, and, on an ongoing basis, in the manpower required to run and maintain the system and in the use of large amounts of alkaline source. (*Id.*) The changes required by Applicants' claims could be corrosive to

Ex. B9, Reply to Office Action, January 15, 2016, 7. This concession directly bears on the proper construction of "determining" because "[t]he doctrine of prosecution disclaimer precludes a patentee "from recapturing through claim interpretation specific meanings disclaimed during prosecution." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003). Indeed, "[a]ny explanation, elaboration, or qualification presented by the inventor during patent examination is relevant, for the role of claim construction is to 'capture the scope of the actual invention' that is disclosed, described, and patented." *Fenner Invs., Ltd. v. Cellco P'ship*, 778 F.3d 1320, 1323 (Fed. Cir. 2015) (*quoting Retractable Techs., Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296, 1305 (Fed. Cir. 2011)).

Despite the fact that none of the then-pending claims (or later issued claims) contained the words "measure, measuring, or measurement," Enviro Tech argued that "additional equipment to measure and monitor the pH" would be needed, at great expense, to modify the prior art to achieve the results of the '321 Patent's claims. Enviro Tech further argued that the prior art actually taught

away from the proposed claims because the prior art did no adjustment, which necessarily included an actual measurement of the pH:

> Dr. Bilgili states that Kurschner clearly teaches away from Applicants' claimed pH ranges. As Dr. Bilgili explains, Kurschner did not <u>actively manage</u> the pH, as Applicants' claims require. In five of Kurschner's seven examples, (examples 1, 2, 3, 4, and 7), the pH of the peracetic acid solution was not adjusted. As shown in Kurschner's Table 1 (8:35-45), the unadjusted pH of the solutions was 2.8-3.7. In Kurschner's other two examples, the pH was adjusted (from the unadjusted range of 2.8-3.7) to pH 5 (an acidic pH) (example 5), or to pH 7 (a neutral pH) (example 6), <u>before</u> placing the poultry into the peracetic acid solution. <mark>Kurschner did no measuring of pH or adjustment of pH after placing the poultry into the solution because there was no reason to do so.</mark> (Bilgili Decl., ¶6.) Kurschner was simply testing the effect of the peracetic acid on the

Ex. B9, Reply to Office Action, January 15, 2016, 9.

Where, as here, Enviro Tech argues that the claims require "measuring of pH"—and that implementation requires "additional equipment to measure and monitor the pH" that was not required by the prior art—Enviro Tech concedes that measuring is the ***only*** way of "determining the pH," thereby surrendering any other method of "determining the pH" other than "measuring the pH." These statements made by Enviro Tech (and its proffered expert, Dr. Bilgili) that "measuring the pH" is required by the claims is known as a prosecution history "disclaimer" or "disavowal" that the public—including Safe Foods—is entitled to rely upon. *See SpeedTrack, Inc. v. Amazon.com*, 998 F.3d 1373, 1380 (Fed. Cir. 2021) ("An applicant's argument that a prior art reference is distinguishable on a particular ground can serve as a disclaimer of claim scope even if the applicant distinguishes the reference on other grounds as well.") (quoting *Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1374 (Fed. Cir. 2007). And "[t]he doctrine of prosecution

- 11 -

disclaimer precludes a patentee "from recapturing through claim interpretation specific meanings disclaimed during prosecution." *Omega Eng'g, Inc.*, *334* F.3d at 1323.

Through Dr. Bilgili's declaration, Enviro Tech unambiguously argued that "determining the pH" means "measuring the pH," and that such measurements were not disclosed in the prior art and would otherwise impose significant burdens on any attempt to modify the prior art, rendering such modifications non-obvious. Enviro Tech is now bound by these arguments and "cannot attempt to distance itself from the disavowal of broader claim scope." *Id.*

The specification further confirms that "determining the pH" requires the actual measurement of the pH. Indeed, in every instance the specification explains how the pH is to be "determined," the disclosure is exclusively limited to methods of measurement. *See, e.g.,* Ex. A, '321 Patent, 32:46-49; 37:29-30 ("The pH [of the PAA-containing water] is determined by any method, including the use of a glass electrode, indicator solutions, and pH test strips."). While "any method" may seem, on its face, to be broad, it is clear from the specification's disclosed examples and experiments that the '321 Patent is referring to methods of actual measurement, not theoretical calculations or pH estimates. Notably, in the experiments included in the specification, the pH of the peracetic acid is repeatedly described as measured:

> In order to determine whether maintaining an elevated pH in a chicken chill tank had an adverse effect on the shelf-life, yield, tenderness, flavor, texture, and color of the food product, Applicants directed a trial at this processing plant that was performed over 13 days. At the start of the trial, at Applicants' direction, the pH of the chicken chill tank water was elevated to a target pH of about 6.0 using 50% NaOH. The pH was measured daily for the 13 days and maintained at about 6 by the addition of 50% NaOH. Surprisingly,

Ex. A, '321 Patent at 58:50-58.

> The pH of the PAA-containing water with the chickens before altering was ==measured== to be 7.5, 7.2, and 7.3 for Bin 1, Bin 2, and Bin 3, respectively. The target pH for the bins was 4.8, 6, and 9 for Bin 1, Bin 2, and Bin 3, respectively. The pH of Bin 1, Bin 2, and Bin 3 was altered to 4.8 (with 5.07 g 32% hydrochloric acid), 6.3 (with 4.54 g 32% hydrochloric acid), and 8.94 (with 3.85 g 50% sodium hydroxide), respectively. The chicken halves were soaked

Ex. A, '321 Patent at 46:39-46; *see also* Ex. A, '321 Patent at 52:48-55.

Simply put, all of the relevant evidence—the claim language itself, the description within the specification of the '321 Patent, and statements made by Enviro Tech during prosecution—leads to the same conclusion: "determining the pH" should be construed as "measuring the pH." Common methods for measuring pH include glass electrodes, indicator solutions, and pH test strips. A theoretical determination of pH from the amounts of water, acid, and base is not sufficient. As such, Defendant respectfully requests that the Court adopt its proposed construction for this term.

**B. "altering the pH of the peracetic acid-containing water" or "altering the pH" (Claims 1, 6, 9, 10, 15, 18, 19, 22, 23, 24, 27, 28, 29, 32, 33)**

| Term | Defendant's Proposed Construction | Plaintiff's Proposed Construction |
|---|---|---|
| altering the pH of the peracetic acid-containing water | raising the pH of the peracetic acid-containing water from the outside to the inside of the claimed range | Plain and ordinary meaning: changing the pH of the peracetic acid-containing water |

The Court should adopt Defendant's proposed construction of the phrase "altering the pH of the peracetic acid-containing water" because it aligns with both the '321 Patent's specification and its prosecution history. The specification unambiguously shows that "altering the pH" requires adjusting it from outside of the claimed pH range to inside of the claimed pH range. The

prosecution history further confirms this, also limiting the direction of the adjustment by clarifying that the pH must be raised from below and into the claimed range.

The specification, which is "the single best guide to the meaning of a disputed term," makes clear that Enviro Tech understood "altering the pH" to mean adjusting the pH from outside to inside of the claimed range. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005). For example, when discussing "altering" to a pH range of "about 6 to about 9," the specification explains that "[i]f the pH is determined to be lower than about 6 or higher than about 9, then a subsequent pH-altering step is performed." Ex. A, '321 Patent, 36:19–21. A source of either alkali or acid is then added to raise or lower the pH, respectively, into the desired range. *See* Ex. A, '321 Patent, 36:21–25, 36:34–38. If, however, "the pH is determined to be about 6 to about 9, then ***no pH-altering step is performed***." Ex. A, '321 Patent, 36:16–19 (emphasis added). Accordingly, the specification confirms that "altering the pH" refers to adjusting the pH from outside to inside of the claimed range. Indeed, common sense dictates this interpretation is correct because one cannot "alter" the pH to a certain range if the pH is already in that range.

The specification repeatedly and consistently characterizes "altering" in this fashion:

and pH test strips. If the pH is determined to be about 6 to about 9, then no pH-altering step is performed and the step

Ex. A, '321 Patent, 32:49–50.

solutions, and pH test strips. If the pH is determined to be about 6 to about 9, then no pH-altering step is performed and the step of bringing at least a portion of a poultry carcass into contact with the PAA-containing water is performed next. If the pH is determined to be lower than about 6 or higher than about 9, then a subsequent pH-altering step is performed. If

Ex. A, '321 Patent, 33:51–56.

> solutions, and pH test strips. If the pH is determined to be about 6 to about 9, then no pH-altering step is performed. If the pH is determined to be lower than about 6 or higher than about 9, then a subsequent pH-altering step is performed. If

Ex. A, '321 Patent, 34:34–37.

> solutions, and pH test strips. If the pH is determined to be about 6 to about 9, then no pH-altering step is performed and the step of placing at least a portion of a poultry carcass into the PAA-containing water is performed next. If the pH is determined to be lower than about 6 or higher than about 9, then a subsequent pH-altering step is performed. If the pH

Ex. A, '321 Patent, 36:16–21.

> a glass electrode, indicator solutions, and pH test strips. If the pH is determined to be about 6 to about 9, then no pH-altering step is performed. If the pH is determined to be lower than about 6 or higher than about 9, then a subsequent pH-altering step is performed. If the pH is determined to be

Ex. A, '321 Patent, 37:30–34. And it is well-established Federal Circuit law "that when a patent 'repeatedly and consistently' characterizes a claim term in a particular way, it is proper to construe the claim term in accordance with that characterization." *GPNE Corp. v. Apple Inc.*, 830 F.3d 1365, 1370 (Fed. Cir. 2016). As such, the Court should adopt Defendant's proposed construction and interpret "altering" in accordance with the '321 Patent's numerous and repeated characterizations reproduced above.

- 15 -

The prosecution history of the '321 Patent also confirms that Safe Foods' construction is correct. An earlier version of the then-pending claims included conditional language stating that "altering" needs to occur only "if the pH is determined to be" outside of the claimed range:

> after the step of providing the peracetic acid-containing water,
> determining the pH of the peracetic acid-containing water, and, if the pH is determined to be lower than about 7.6 or higher than about 10, then altering the pH of the peracetic acid-containing water to a pH of about 7.6 to about 10;

Ex. B13, Notice of Allowability, March 23, 2017, 2. Under this version, "altering" does not have to be performed if the pH is within the specified range. This is consistent with the specification which, as discussed earlier, explains that a pH-altering step is performed only if the pH is determined to be outside of the claimed range. This language, however, is not in the claims as granted. Enviro Tech explicitly removed the conditional language in a later amendment:

> after the step of providing the peracetic acid-containing water,
> determining the pH of the peracetic acid-containing water, and, if the pH is determined to be lower than about 7.6 or higher than about 10, then altering the pH of the peracetic acid-containing water to a pH of about 7.6 to about 10 by adding an alkaline source;

Ex. B15, Amendment, November 20, 2017, at 2.[4] Unlike the previous version, this version expressly requires "altering" to be performed no matter the circumstances.

Moreover, the addition of "by adding an alkaline source" to the claim language also clarifies that "altering" requires raising the pH from below the claimed range. *See* Ex. A, '321 Patent, 36:23–25 ("[A] source of alkali is added to the PAA-containing water to raise the pH.").

---

[4]    The quoted amendment is for then-pending claim 19. However, this same amendment was also made in this submission for each of the then-pending four independent claims, claims 19, 32, 43, and 50, which would, after various amendments, ultimately issue as independent claims 1, 10, 19, and 24, respectively, of the '321 Patent.

Indeed, Enviro Tech explained that under the amended claims, "altering" requires "rais[ing]" the pH to a specific range by adding an alkaline source:

> As amended, the claims require adding an alkaline source to alter the pH of the peracetic acid-containing water to <mark>raise</mark> it to a specific pH range: about 7.6 to about 10 (claims 19-21, 23-25, and 29-31); about 7.6 to about 9.3 (claims 32-37 and 40-42); about 7.6 to about 9 (claims 43-46 and 49); and about 8 to about 9 (claims 50-53 and 56).

Ex. B15, Amendment, November 20, 2017, 9; *see also id.* at 18 ("Applicants' claims . . . require raising the pH by adding an alkaline source."), 20 (stating that "an alkaline source is added to raise the pH" in Applicants' system); Ex. B16, Declaration of Sacit F. Bilgili, November 19, 2017, ¶ 5 (distinguishing prior art because it would not be "obvious to add an alkaline source and raise the pH of the peracetic-acid containing water"), ¶ 7 ("Enviro Tech's claimed method is a peracetic acid disinfection system in which an alkaline source is added specifically to raise the pH."). This is important because a court "cannot construe the claims to cover subject matter broader than that which the patentee itself regarded as comprising its inventions and represented to the PTO." *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1349 (Fed. Cir. 2004). Therefore, in the context of the '321 Patent's claims, "altering the pH" also requires "raising" it.

Accordingly, based on the specification and prosecution history, the Court should adopt Defendant's proposal and construe "altering the pH of the peracetic acid-containing water" to mean "raising the pH of the peracetic acid-containing water from outside to inside the claimed range."

### C.  "after the step of…[b], [c], [d], [e]" (Claims 1, 10, 19, 24, 29)

| Term | Defendant's Proposed Construction | Plaintiff's Proposed Construction |
|---|---|---|
| "after the step of…[b], [c], [d], [e]" | The "after the step of" limitations require the steps of the claims to be performed in the order recited | Plain and ordinary meaning: subsequent to |

Where the steps of a method claim specify an order of operation, the claims are limited to procedures done in the claimed sequence. *Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1342 (Fed. Cir. 2001) (noting that there is an exception to the general rule when "the steps of a method actually recite an order"). Here, the '321 Patent limitations explicitly specify the order in which they are to be carried out. Specifically, every independent claim limitation of the '321 Patent, save the first, begins with "after the step of _____," where the fill-in-the-blank portion references the prior step. That is:

- Step [a] is "providing" PAA-containing water, and step [b] starts with "***after the step of*** providing the PAA-containing water;"

- Step [b] is determining and altering the pH of the provided PAA-containing water, and Step [c] begins with "***after the step of*** determining the pH and altering the pH;"

- Step [c] specifies "placing" a poultry carcass in the determined and altered PAA-containing water, and Step [d] starts with "***after the step of*** placing at least the portion of the poultry carcass into the PAA-containing water;"

- Step [d] is a second "determining and altering" of the PAA-containing water with the placed poultry carcass, and Step [e] starts with "***after the step of*** determining the pH and altering the pH of the PAA-containing water having at least the portion of the poultry carcass therein;" and, finally,

- Step [e] is "removing" the poultry carcass.

Therefore, the plain language of the claims explicitly requires the order of operation as recited, so that, for instance, a party that performed Step [c], placing into the PAA water even "a portion of a poultry carcass," before Step [b], determining and altering the pH of the PAA water, does not meet satisfy the claim as written.

While the express language of the claims should end this matter, see *Tempo Lighting, Inc. v. Tivoli, LLC*, 742 F.3d 973, 977 (Fed. Cir. 2014) ("In claim construction, this court gives primacy to the language of the claims."), the '321 Patent's specification further confirms that the steps must be performed in the recited order. For instance, when describing the treatment of the poultry carcass, the specification says "***after*** the step of providing a PAA-containing water having a pH of about 6 to about 9, a step of determining the pH of the PAA-containing water and a subsequent step of altering the pH may be performed." Ex. A, '321 Patent, 32:43–46 (emphasis added). The specification further states that "the step of placing at least the portion of the poultry carcass into the PAA-containing water is performed ***next***." Ex. A, '321 Patent, 32:50–52 (emphasis added). By using the words "after" and "next," the specification is clear that there is a temporal condition, whereby the altering and determining must be done after the providing of the PAA-water, and no portion of the carcasses is placed into the PAA-containing water until the first determining step is done.

This is further confirmed by the prosecution history, which also requires the specifically claimed order. When the Examiner first allowed claims on March 23, 2017, she required an examiner's amendment[5] that specifically added the "after the step of . . ." limitation to pending

---

[5]     Just as an applicant may narrow claim limitations by modifying their text in an attempt to differentiate the claimed invention from the prior art references, an Examiner may propose such changes the Examiner believes would be necessary to distinguish the claimed invention from what had already been done for an applicant's consideration via an "examiner's amendment." 37 C.F.R § 1.121(g).

claim 19 (which with further amendments would eventually be renumbered as issued claim 1) as follows:

Claims 19, 32, 43 and 50 have been **amended** by Examiner's amendment.

**Please amend claim 19 as follows:**

19. A method of treating at least a portion of a poultry carcass, said method comprising the steps of:

providing, in a reservoir, a peracetic acid-containing water, wherein the peracetic acid-containing water comprises water and an antimicrobial amount of a solution of peracetic acid;

after the step of providing the peracetic acid-containing water,

determining the pH of the peracetic acid-containing water, and, if the pH is determined to be lower than about 7.6 or higher than about 10, then altering the pH of the peracetic acid-containing water to a pH of about 7.6 to about 10;

after the step of determining the pH and altering the pH of the peracetic acid-containing water,

placing into the peracetic acid-containing water at least a portion of a poultry carcass;

after the step of placing at least the portion of the poultry carcass into the peracetic acid-containing water,

determining the pH of the peracetic acid-containing water in the reservoir with at least the portion of the poultry carcass therein, and, if the pH is determined to be lower than about 7.6 or higher than about 10, then altering the pH of the peracetic acid-containing water to a pH of about 7.6 to about 10; and

after the step of determining the pH and altering the pH of the peracetic acid-containing water having at least the portion of the poultry carcass therein,

removing at least the portion of the poultry carcass from the peracetic acid-containing water.

Ex. B13, Notice of Allowability, March 23, 2017, 2. The Examiner noted that "[a]uthorization for this examiner's amendment was given in an interview with [Enviro Tech's counsel]." Ex. B13, Notice of Allowability, March 23, 2017, 2. Nonetheless, the Examiner gave Enviro Tech a chance to object, noting that "[s]hould the changes and/or additions be unacceptable to applicant, an amendment may be filed." Ex. B13, Notice of Allowability, March 23, 2017, 2. But Enviro Tech did not object, and instead paid the issue fee on April 4, 2017. Ex. B14, Part B – Fee(s) Transmittal,

April 4, 2017.[6] By doing so, Enviro Tech agreed to and accepted the "after the step of . . ." limitations. *See TorPharm, Inc v. Ranbaxy Pharmas, Inc.*, 336 F.3d 1322, 1330 (Fed. Cir. 2003) ("[I]n ascertaining the scope of an issued patent, the public is entitled to equate an inventor's acquiescence to the examiner's narrow view of patentable subject matter with abandonment of the rest. Such acquiescence may be found where the patentee . . . lets stand an examiner's restrictive interpretation of a claim.") (citing *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 978–79 (Fed. Cir. 1999)).

The sequential nature of the claimed steps is again confirmed by the prosecution history after Enviro Tech withdrew its application from issuance and requested further examination in light of additional prior art. In particular, on October 21, 2019, Enviro Tech submitted an appeal brief (once the claims were rejected over that additional art) that included the Declaration of Dr. Sacit F. Bilgili. In this declaration, Dr. Bilgili wrote:

> 3. All of the pending claims in Enviro Tech's patent application require <u>actively managing the pH</u> of the peracetic acid-containing water in a poultry chill tank. This method is unique. Adjusting the pH of the peracetic acid-containing water in a chill tank had never been done before in poultry processing. The pending claims require at least two pH adjustment steps: first, adjusting the pH to a specific pH range above its natural, acidic level <u>before</u> placing the poultry in the chill tank; and, second, adjusting the pH to that specific range <u>after</u> placing the poultry in the chill tank to maintain the pH in that specific range. I understand that the claims require specific pH ranges of 7.6-10, 7.6-

---

[6]    The application did not issue as a result of the payment of the issue fee, as Enviro Tech filed a Request for Continued Examination on April 24, 2017, submitting additional prior art for consideration by the Examiner.

Ex. B10, Declaration of Sacit F. Bilgili, January 13, 2016, ¶ 3.[7] As seen, Enviro Tech's declarant stressed the sequential nature of the claimed method, emphasizing that Step [b] (the first determining and altering the carcass-free PAA water) is done "<u>before</u>" Step [c] (the placing of even a portion of the poultry in the altered PAA) and Step [d] (the second determining and altering with the poultry in the reservoir) is only done "<u>after</u>" Step [c]. Likewise, during the appeal hearing, Enviro Tech's attorney explained the claimed process saying:

> 19    So the steps of the method are, as I said, are the same except for the
> 20    pH range.  The peracetic acid is provided in the water in the chill tank.  The
> 21    pH is determined.  An alkaline source which is usually sodium hydroxide is
> 22    added to that chill tank to raise the pH to the specified alkaline range.  The
> 23    poultry is then added.  The pH is then determined again and the alkaline
> 24    source is the same one is added again to maintain the pH at the same range
> 25    that was selected and of course at the end, the poultry is removed from the

Ex. B17, Record of Oral Hearing, January 4, 2021, 3:19-25. Once again, the use of "then" indicates that poultry is only added after the first determining and altering Step [b] and second determining of Step [d] only occurs after the placing poultry in Step [c]. The prosecution history, then, is consistent with the plain and clear meaning of the claims and the Examiner's amendment: that Steps [a]-[e] are sequential. As confirmed by Enviro Tech's own declarant and attorney, if Step [c] is performed (putting any poultry in the chill tank) prior to Step [b] (determining and adjusting the pH) the adjusting would not occur "<u>before</u> placing the poultry in the chill tank" (Ex. B10 at ¶ 3 (emphasis in original)) and the method as claimed has not been performed.

---

[7]    While this declaration of Sacit F. Bilgili had been previously submitted during prosecution in 2016, it was resubmitted in 2019 as part of Enviro Tech's appeal.

As with respect to the "determining the pH" term, Enviro Tech's submission of Dr. Bilgili's declaration to interpret the claims in an attempt to overcome the cited prior art is a prosecution history "disclaimer" or "disavowal" that the public is entitled to rely upon. *See, e.g.*, *Omega Eng'g, Inc.* 334 F.3d at 1324–25. And "[t]he doctrine of prosecution disclaimer precludes a patentee "from recapturing through claim interpretation specific meanings disclaimed during prosecution." *Id.* at 1323. Such argument "serve[s] as a disclaimer of claim scope even if the applicant distinguishes the reference on other grounds as well." *Am. Piledriving Equip., Inc.*, 637 F.3d at 1336 (citation omitted). This disclaimer is also effective "regardless of whether the examiner agreed" because the patentee's "statements still inform the proper construction of the term[s]." *Id.* (citation omitted). Once, as here, a patentee unambiguously argues that the steps are sequential it "cannot attempt to distance itself from the disavowal of broader claim scope." *Id.*

Although for any generic patent "not every process claim is limited to the performance of its steps in the order written," here for the '321 Patent, a limiting construction is warranted because "the language of the claim, the specification and the prosecution history support a limiting construction." *See Loral Fairchild Corp. v. Sony Corp.*, 181 F.3d 1313, 1321–22 (Fed. Cir. 1999). Accordingly, based on this intrinsic evidence, the Court should adopt Defendant's proposal.

## IV.     RELEVANT LEGAL STANDARDS FOR INDEFINITENESS

As explained below, the Asserted Claims of Enviro Tech's '321 Patent are indefinite and therefore invalid. Indefiniteness is a matter of law that courts routinely consider during the claim construction process. *Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1319 (Fed. Cir. 2008) ("Indefiniteness is a matter of claim construction, and the same principles that generally govern claim construction are applicable to determining whether allegedly indefinite claim language is subject to construction.").

Under 35 U.S.C. § 112,[8] the specification of a patent "shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." To satisfy this requirement, referred to as the definiteness requirement, the "patent's claims, viewed in light of the specification and prosecution history, [must] inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014). The "patent must be precise enough to afford clear notice of what is claimed, thereby 'apprising the public of what is still open to them' . . . in a manner that avoids '[a] zone of uncertainty which enterprise and experimentation may enter only at the risk of infring[ing] claims." *Id.* at 899 (internal citations omitted); *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1350 (Fed. Cir. 2005) ("Some objective standard must be provided in order to allow the public to determine the scope of the claimed invention"); *Morton Int'l, Inc. v. Cardinal Chem. Co.,* 5 F.3d 1464, 1470 (Fed.Cir.1993) (claims must be "sufficiently precise to permit a potential competitor to determine whether or not he is infringing"). Where, as here, the scope of a term cannot be reasonably ascertained, the term is indefinite and, therefore, the claim is indefinite and invalid.

## V.      THE TERMS "ABOUT" AND "ANTIMICROBIAL AMOUNT" ARE INDEFINITE

The parties have identified two (2) terms from the claims of '321 Patent, "about," used to describe pH, and "antimicrobial amount," that Safe Foods asserts are indefinite, rendering all the Asserted Claims of the '321 Patent invalid. Safe Foods addresses each, in turn, below.

---

[8]      On September 16, 2011, Congress passed the America Invents Act ("AIA") that, among other things, made § 112 paragraphs (1–6) subsections with lower roman letters (a–f). The Leahy-Smith America Invents Act, Pub. L. No. 112-29, 125 Stat. 284 (2011) (codified in various sections of Title 35 of the United States Code). The AIA took effect on March 16, 2013. AIA §§ 6(f)(2)(A), 3(n)(1). As the '321 Patent was filed on August 16, 2011, pre-AIA, Defendant uses the pre-AIA numbering scheme.

### A.    "about" (with reference to pH) (Claims 1, 10, 19, 24, 29)

| Term | Defendant's Proposed Construction | Plaintiff's Proposed Construction |
|---|---|---|
| about | Indefinite | Plain and ordinary meaning: approximately |

The term "about" is found in each of the five independent claims (claim 1, 10, 19, 24, 29, each an Asserted Claim) with reference to recited pH values. Because the term "about" is present in all of the independent claims of the '321 Patent, whether its scope can be reasonably ascertained is therefore at issue for all of the claims of the '321 Patent. Inconsistencies between the claims, specification, and prosecution history demonstrate that the scope of the claims containing the term cannot be reasonably ascertained and all claims of the '321 Patent are indefinite and therefore invalid.

The independent Asserted Claims of the '321 Patent use the term "about" in steps [b] and [d] of the recited methods, stating the beginning and ending pH of a range of pHs to which the peracetic acid-containing water is "alter[ed]." Claim 1 of the '321 Patent is exemplary:

| Claim Element | Claim Language |
|---|---|
| [pre] | A method of treating at least a portion of a poultry carcass with peracetic acid, said method comprising the steps of: |
| [a] | providing, in a reservoir, a peracetic acid-containing water, wherein the peracetic acid-containing water comprises water and an antimicrobial amount of a solution of peracetic acid; |
| [b] | after the step of providing the peracetic acid-containing water, determining the pH of the peracetic acid-containing water, and altering the pH of the peracetic acid-containing water to a pH of about 7.6 to about 10 by adding an alkaline source; |

| | |
|---|---|
| [c] | after the step of determining the pH and altering the pH of the peracetic acid-containing water, placing into the peracetic acid-containing water at least a portion of a poultry carcass; |
| [d] | after the step of placing at least the portion of the poultry carcass into the peracetic acid-containing water, determining the pH of the peracetic acid-containing water in the reservoir with at least the portion of the poultry carcass therein, and altering the pH of the peracetic acid-containing water to a pH of about 7.6 to about 10 by adding an alkaline source; and |
| [e] | after the step of determining the pH and altering the pH of the peracetic acid-containing water having at least the portion of the poultry carcass therein, removing at least the portion of the poultry carcass from the peracetic acid-containing water. |

Ex. A, '321 Patent, 61:31-58 (claim 1). Each of the five independent claims in the '321 Patent are identical except for the pH ranges recited in the two steps [b] and [d] highlighted above for claim 1. In the independent claims, these pH ranges are as follows: "about 7.6 to about 10" in claim 1, "about 7.6 to about 9.3" in claim 10, "about 7.6 to about 9" in claim 19, "about 8 to about 9" in claim 24, and "about 9 to about 10" in claim 29.

Use of the term "about" in patent claims is not uncommon, and certain courts have found that, for the specific patent claims at issue before them, the term satisfies the definiteness requirement. The term is often viewed as meaning "approximately." Importantly, however, courts have found that the term can be indefinite where, as here, no objective meaning can be discerned from the claims, specification, and prosecution history. *Amgen, Inc. v. Chugai Pharm. Co., Ltd.*, 927 F.2d 1200, 1218 (Fed. Cir. 1991) ("at least about 160,000 IU/AU" was indefinite since it did not apprise how much below the 160,000 value was being claimed, there was close prior art at 128,620 IU/AU that the patentee distinguished during prosecution, and the patentee's use of "about

160,000" "constitute[d] an effort to recapture" the disclaimed portion of the invention); *Synthes (USA) v. Smith & Nephew, Inc*., No. 03-cv-0084, 2008 WL 343114 (E.D. Pa. Feb. 4, 2008) (applying pre-*Nautilus* standard, but persuasively reasoning that "less than about 2%" was indefinite because it was insolubly ambiguous and a competitor would not know the bounds of the limitation where the specification provide no guidance as to how much above 2% would qualify as "about 2%"). As explained below, the use of the term "about" to describe pH in the claims of the '321 Patent suffers from the very same infiniteness problems identified in *Amgen* and *Synthes*.

Specifically, no objective standard for determining the scope of "about" in the Asserted Claims can be discerned from the intrinsic evidence. The claims, specification, and prosecution history of the '321 Patent all contain conflicting statements such that the scope of "about" in describing pH that cannot be reconciled and therefore determined with reasonable certainty. Conflicting statements abound, but for sake of efficiency, Defendant focus on statements leading to several irreconcilable conclusions regarding the scope of "about."

First, from the Asserted Claims, one concludes that "about" (in the context of pH) must be ***less than*** 0.3. But from the specification, which provides no definition for "about," one concludes that "about" must be ***greater than*** 0.3. And from certain arguments in the prosecution history, one concludes that "about" must be ***less than*** 0.3. But pivoting yet again, other arguments in the prosecution history lead to the conclusion that "about" must be ***include*** 0.3 or be ***ignored completely*** and interpreted as "exactly." There is no way for the Court to harmonize these ever-shifting conclusions drawn from the claims, the specification, and the prosecution history. The intrinsic evidence does not provide a scope for the term "about" with reasonable certainty. Consequently, the term "about," when used in reference to pH in the claims of the '321 Patent, is indefinite. As such, all claims of the '321 Patent are indefinite and invalid.

### 1.   Meaning Based Upon the Claims of the '321 Patent

As an initial matter, neither the claims nor the specification, which will be discussed later, provide a definition for the term "about;" however, a comparison of the claims leads one to conclude that it must mean a variation in pH of less than 0.3. In determining whether the term "about" has an objective meaning, three of the independent claims of the '321 Patents, claims 19, 10, and 1, are particularly relevant. Claim 19 of the '321 Patent recites a method of poultry treatment using peracetic acid where the pH is altered to a pH of "about 7.6 to about 9." Ex. A., '321 Patent, 63:31-58 (claim 19). Claim 10 of the '321 Patent recites a method of poultry treatment using peracetic acid where the pH is altered to a pH of "about 7.6 to about 9.3." Ex. A., '321 Patent, 62:31-58 (claim 10). Claim 1 of the '321 Patent recites a method of poultry treatment using peracetic acid where the pH is altered to a pH of "about 7.6 to about 10." Ex. A, '321 Patent, 61:31-58 (claim 1). In order for claim 1, claim 10, and claim 19 to be separate (and differentiated) claims, "about" cannot be interpreted such that the claims have the same scope. A comparison of claim 10 and claim 19 is instructive. If "about" is interpreted to mean 0.3 or more, the recitation of "about 9" in claim 19 would extend to a pH of 9.3, and the recitation of "about 9.3" in claim 10 would extend to a pH of 9.0. The resultant claims are not patentably distinct. As such, the claims suggest that "about" means a pH variance of less than 0.3.

### 2.   Meaning Based Upon the Specification of the '321 Patent

The specification of the '321 Patent does not contain a definition of the term "about." The numbered examples in the '321 Patent are, however, instructive. Example 18 is particularly relevant. Example 18 describes "treating poultry carcasses in chilled PAA-containing water (90 ppm PAA) having a pH of 6 or a pH of 9." Ex. A., '321 Patent, 43, 6-8. Notably, Example 18 is an evaluation of treatment of poultry carcasses at a pH of "9" and not an evaluation at a pH of

"about 9." In the evaluation at a pH of 9, the pH was measured prior to the addition of chicken halves and measured to be 9.3, with Enviro Tech noting that the target was a pH of 9. Ex. A, '321 Patent, 43:62 – 44:3 ("The pH of the PAA-containing water was measured to be 9.3. The target pH for this bin was pH 9."). In describing the results, Enviro Tech characterized Example 18 as an evaluation conducted at a pH of 9. *See, e.g.*, Ex. A., '321 Patent, 44:11 -46:2 (noting in particular the discussion of Table XXV and Figure 2). From this Example 18, one concludes that a pH of 9.3 is identical to a pH of 9, and that "about" when used to describe pH must be more than 0.3. This is contrary to the conclusion reached from comparing independent claims 19 and 10 of the '321 Patent, which alternatively cite pH ranges of "about 7.6 to about 9" and "about 7.6 to about 9.3." *See* Section V.A.1, *supra*. It is noteworthy that, during prosecution, Enviro Tech cited Example 18 and its measured pH of 9.3, which one concludes from the Example is identical to a pH of 9, as written description support of a pH of "about 9.3" for the claim that would, with additional amendments, ultimately issue as claim 10. Ex. B6. Amendment, July 10, 2015, 22 (discussing newly added claim 32 and stating that "[t]he upper end of the pH range, 9.3, is specifically mentioned in example 18").

### 3.  Meaning Based Upon the Prosecution History of the '321 Patent

Once again, at no point during the prosecution of the '321 Patent did Enviro Tech expressly provide a definition for the term "about." Enviro Tech did, however, make arguments during the prosecution that alternatively lead to the conflicting conclusions that "about" with reference to pH must be less than 0.3, that "about" with reference to pH must include 0.3, and that "about" with reference to pH must be interpreted as "0.0" or "exactly."

a.  **Enviro Tech's prosecution arguments dictating that "about" means a pH of less than 0.3.**

As originally filed, all of the independent claims recited a pH range of about 6 to about 9. Ex. B1, Claims, August 16, 2011, 118-19 (see, for example, original claim 19, which with amendments would ultimately issue as claim 1, is cited as an example). In the first Office Action, the PTO Examiner rejected the claims over prior art U.S. Patent No. 5,632,676 to Kurschner et al. ("Kurschner '676"). [9] Ex. B2, Office Action, September 16, 2014, 3-7. In particular, the Examiner stated that Kurschner '676 discloses treatment of poultry with PAA at various pHs, including a pH of 7. Ex. B2, Office Action, September 16, 2014, 4.

In response to the Office Action, Enviro Tech cancelled all the independent claims, except claim 19, which was amended to recite a pH range of "about 7.3 to about 10" (instead of the original "about 6 to about 9"). [10] Ex. B3, Amendment, December 18, 2014, 2-5. Enviro Tech acknowledged that Kurschner '676 taught treatment of fowl with PAA at a pH of 7, but argued that "Kurschner does *not* disclose adjusting the pH of the peracetic acid solution to a pH of 7.3-10" and that "[t]hus, Applicants' claims are not obvious over Kurschner." Ex. B3, Amendment, December 18, 2014, 7. In making this argument to distinguish prior art, and other arguments later in the prosecution (discussed subsequently), Enviro Tech ignored the "about" language that modified the pH range recited in the claims. As a consequence of this amendment, Enviro Tech represented that a pH of "about 7.3" does not mean a pH of 7.0, i.e., in Enviro Tech's view, "about" means less than 0.3. In making the amendment, Enviro Tech also attempted to address the Examiner's statement that the gap between the prior art at a pH of 7.0 and the claims could not be "close enough that one skilled in the art would have expected them to have the same properties."

---

[9]    Kurschner '676 is provided as Exhibit C1.
[10]    Claim 19 is of particular relevance as claim 19, after several amendments, ultimately issues as claim 1 of the '321 Patent.

Ex. B2, Office Action, September 16, 2014, 6 (citing Kurschner '676). Therefore, Enviro Tech conceded that "about" means significantly less than 0.3, so that the lower range of the claim of "about 7.3" would be sufficiently far away from Kurschner '676's disclosure of a pH of 7.0 such that the two were not too "close." Based on these statements made and actions taken by Enviro Tech in the prosecution history, "about" means less than 0.3.

### b.  Enviro Tech's prosecution arguments dictating that "about" means a pH of 0.3.

After the sole independent claim, claim 19, was amended to recite a pH of "about 7.3," the Examiner again rejected all claims, finding them unpatentable over Kurschner '676. Ex. B5, Office Action, January 27, 2015, 3. The Examiner explained that "Kurschner discloses adjusting pH to 7," and that "[t]here is no evidence of the criticality of the pH adjustment to 7.3 as opposed to 7. It appears that both pH adjustment to 7 and 7.3 produce the same result." Ex. B5, Office Action, January 27, 2015, 7. In view of these statements, the Examiner could only have concluded that "about" means 0.3 (or something sufficiently close to 0.3) to render the gap between Kurschner '676's pH of 7 and the pH of "about 7.3" in Enviro Tech's amended claims too "close." In response to this Office Action, claim 19 was amended to recite a pH of "about 7.6" instead of a pH of "about 7.3," thereby conceding that the Examiner's conclusion that "about" would include a pH of 0.3 was correct. Ex. B6, Amendment, July 10, 2015, 2 (amendment of claim 19).

### c.  Enviro Tech's prosecution arguments dictating that "about" means "0.0" or "exactly"

After amending claim 19 in the July 10, 2015 Amendment to recite "about 7.6," the Examiner again rejected the claim, explaining that "about 7.6" still overlapped with, or came too close to, Kurschner '676's disclosure of 7.0. Ex. B8, Office Action, July 15, 2015, 21. In an attempt to overcome the rejection, Enviro Tech made several arguments in which it ignored the term

"about," equating "about 7.6 to about 10" to exactly 7.6 and exactly 10. For instance, Enviro Tech argued that "a person would not find it obvious to adjust the pH up to any of the pH ranges claimed by Applicants (7.6-10, 7.6-9.3, 7.6-9, or 8-9)." Ex. B9, Reply to Office Action, January 15, 2016, 8. Additionally, "a person skilled in the art would be disinclined to raise the pH . . . to the pH ranges of Applicants' claims knowing that a peracetic acid solution at pH 7.6 is about 4 times more alkaline than a solution at pH 7.0." Ex. B9, Reply to Office Action, January 15, 2016, 9. Enviro Tech also argued that "[t]hese claims, which require a step of adjusting the pH to the range of 7.6 to 10, are not obvious over Kurschner." Ex. B9, Reply to Office Action, January 15, 2016, 14. Finally, Enviro Tech argued that "[a] peracetic acid solution at the lower end of the claimed range, pH 7.6, has four times more hydroxide ion than Kurschner's peracetic acid solution at pH 7." Ex. B9, Reply to Office Action, January 15, 2016, 14. In all these instances, Enviro Tech equated its claims of "about 7.6 to about 10" to exactly "7.6-10," "at pH 7.6," or "the range of 7.6 to 10." It is only after these arguments that the Examiner capitulated and allowed claims.[11] Based on these arguments made by Enviro Tech, about when used with reference to pH means "0.0" or "exactly."

Enviro Tech also cannot attribute these arguments equating "about 7.6" with "exactly 7.6" to poor drafting of its January 15, 2016 Reply. In contrast to the arguments described above—and others where Enviro Tech intentionally left out "about" when referring to a claimed range that included a pH of 7.6 to increase its chances of obtaining a patent without further amendments— Enviro Tech was much more cavalier in including "about" when addressing claims reciting a pH range of 8-9 that were further removed from Kurschner '676's disclosure of pH 7. In arguments

---

[11]    The Examiner issued an initial Notice of Allowance on July 27, 2016. The application did not issue as a result of that Notice of Allowance, as Enviro Tech filed a Request for Continued Examination on October 12, 2016, submitting additional prior art for consideration by the Examiner.

addressing pending claim 19-31, 32-42, and 43-49, Enviro Tech argues that the claims "require a step of adjusting the pH to the range of" "7.6- to 10," "7.6 to 9.3," and "7.6 to 9," respectively, with "about" conspicuously absent. Ex. B9, Reply to Office Action, January 15, 2016, 14-15. (Sections 8.B, 8.C, and 8.D). This is in contrast to the arguments regarding claims 50-56 where Enviro Tech argues that the claims "require a step of adjusting the pH to the range of *about* 8 to *about* 9." Ex. B9, Reply to Office Action, January 15, 2016, 15. (Section 8.E).

### 4. "About" is indefinite because any other conclusion would allow Enviro Tech to improperly recapture scope that was surrendered during prosecution

In *Amgen*, the Federal Circuit found claim limitations reciting "about 160,000 IU/AU" were indefinite because it failed to "distinguish the invention over the close prior art (which described preparations of 120,000 IU/AU)" and failed to "permit one to know what specific activity values below 160,000, if any, might constitute infringement." *Amgen,* 927 F.2d at 1217. Enviro Tech's claims in the '321 Patent using "about" to describe pH are indefinite for the same reasons.

In *Amgen*, the Examiner found during prosecution that the prior art disclosed an activity level of 128,620, which required the applicants to amend their claims from "about 120,000" to "about 160,000." This is much like Enviro Tech's response during the prosecution of the '321 Patent to the Examiner's finding of prior art disclosing a pH at 7.0, amending original claims reciting a pH of "about 6" to recite a pH of "about 7.3" and later to recite a pH of "about 7.6." In *Amgen*, the Court affirmed the finding that "the addition of the word 'about' seems to constitute an effort to recapture . . . a mean activity somewhere between 120,000, which the patent examiner found was anticipated . . . and the 160,000 IU/AU." *Id*. at 1218. The Court further affirmed that "about" "gives no hint" as to which values between 120,000 and 160,000 would constitute

- 33 -

infringement, and therefore are indefinite. *Id*. Likewise, Enviro Tech's addition of "about" to claims for a pH of "about 7.6" constitutes an effort to recapture pHs below 7.6 that the Examiner found were disclosed by the close prior art, and further, "about 7.6" provides no hint as to what would constitute infringement between a pH of 7.0 (as found by the Examiner in Kurschner '676) and 7.6 (as finally claimed by Enviro Tech). Thus, "[w]hen the meaning of claims is in doubt, especially when, as is the case here, there is close prior art, they are properly declared invalid." *Amgen*, 927 F.2d at 1218 (*citing Standard Oil Co. v. American Cyanamid Co.*, 774 F.2d 448, 453 (Fed. Cir. 1985)).

In view of the foregoing arguments addressing the conflicting conclusions drawn from the claims, specification, and prosecution history of the '321 Patent, the claims of the '321 Patent reciting "about" a certain pH are indefinite and therefore, invalid. The claim language is not "precise enough to afford clear notice of what is claimed." *Nautilus*, 572 U.S. at 899.

### B.  "antimicrobial amount" (Claims 1, 2, 3, 10, 11, 12, 19, 24, 29)

| Term | Defendant's Proposed Construction | Plaintiff's Proposed Construction |
| --- | --- | --- |
| "antimicrobial amount" | Indefinite | Plain and ordinary meaning: an amount sufficient to eradicate or reduce microorganisms |

The term "antimicrobial amount" is found in each of the five independent claims (claim 1, 10, 19, 24, 29, each an Asserted Claim). The term is, however, also at issue for all dependent Asserted Claims. Specifically, the term "antimicrobial amount" is also found in the following dependent Asserted Claims of the '321 Patent: claims 2, 3, 11, and 12. Because the scope of this term cannot be reasonably ascertained, Safe Foods asserts that the use of the term in the Asserted Claims is indefinite and that the Asserted Claims, therefore, are indefinite and invalid.

The Asserted Claims of the '321 Patent recite a "method of treating at least a portion of a poultry carcass" and use the term "antimicrobial amount" to describe an amount of a "solution of peracetic acid" employed in the method. As previously described, there are differences in the independent claims with respect to the recited pH ranges, but "antimicrobial amount" is found in the first method step, which is identical in each of the independent claims. Claim 1 of the '321 Patent is exemplary:

> 1. A method of treating at least a portion of a poultry carcass with peracetic acid, said method comprising the steps of:
> providing, in a reservoir, a peracetic acid-containing water, wherein the peracetic acid-containing water comprises water and an antimicrobial amount of a solution of peracetic acid;
> after the step of providing the peracetic acid-containing water,. determining the pH of the peracetic acid-containing water, and altering the pH of the peracetic acid-containing water to a pH of about 7.6 to about 10 by adding an alkaline source;
> after the step of determining the pH and altering the pH of the peracetic acid-containing water, placing into the peracetic acid-containing water at least a portion of a poultry carcass;
> after the step of placing at least the portion of the poultry carcass into the peracetic acid-containing water, determining the pH of the peracetic acid-containing water in the reservoir with at least the portion of the poultry carcass therein, and altering the pH of the peracetic acid-containing water to a pH of about 7.6 to about 10 by adding an alkaline source; and
> after the step of determining the pH and altering the pH of the peracetic acid-containing water having at least the portion of the poultry carcass therein, removing at least the portion of the poultry carcass from the peracetic acid-containing water.

Ex. A, '321 Patent, 61:31-58 (claim 1).

No objective standard for determining the scope of "antimicrobial amount" in the Asserted Claims can be discerned from the intrinsic evidence. The Asserted Claims fail to inform, with reasonable certainty, those skilled in the art the scope of "an antimicrobial amount," even when read in light of the specification delineating the patent and the prosecution history. The Asserted

Claims do not provide guidance as to the bounds of an "an antimicrobial amount" "of a solution of peracetic acid" that is commensurate with the full scope of the claims. The specification of the '321 Patent provides no objective standard by which a person of ordinary skill in the art could determine the meaning and scope of "an antimicrobial amount," as recited in the Asserted Claims. Moreover, the prosecution history of the '321 Patent does not aid in determining the meaning and scope of the term. Instead, the prosecution history of the '321 Patent further obfuscates the issue. Therefore, as set forth below, the bounds of "an antimicrobial amount," as recited in the Asserted Claims, is subjective, rendering all Asserted Claims indefinite and invalid.

### 1.  Meaning Based Upon the Claims of the '321 Patent

The Asserted Claims recite "an antimicrobial amount *of a solution* of peracetic acid," and not "an antimicrobial amount of peracetic acid." Ex. D, Dr. Mills Decl., ¶ 24. The claim language does not provide an objective basis to determine the ***unrecited*** "antimicrobial amount of peracetic acid." Ex. D, Dr. Mills Decl., ¶ 24. This, in itself, renders the term indefinite because the amount of peracetic acid, or any other related presumptive disinfecting agent that may be present, in a solution of peracetic acid will vary depending on multiple factors. Ex. D, Dr. Mills Decl., ¶ 24. The amount of peracetic acid in the "solution of peracetic acid" will vary depending on the concentration of peracetic acid in the solution—the same volume of a 10% peracetic acid solution will contain a greater amount of peracetic acid than a 5% peracetic acid solution. Ex. D, Dr. Mills Decl., ¶ 24. The amount of peracetic acid will also vary based on the method used to prepare the peracetic acid and the conditions, such as pH and temperature, under which the peracetic acid is used. Ex. D, Dr. Mills Decl., ¶ 24. Variations in the method of preparation and variability in the conditions of use will also lead to varying amounts of other compounds, including hydrogen peroxide and other reactants, used to produce the peracetic acid and peracetate ion and other

compounds into which peracetic acid dissociates. Ex. D, Dr. Mills Decl., ¶ 24. All of these variables will impact the "antimicrobial" effectiveness of the peracetic acid solution. Ex. D, Dr. Mills Decl., ¶ 24.

The recitation of a specific concentration range of peracetic acid of from about 1 ppm ("parts per million") to about 99 ppm in unasserted dependent claims (such as claim 4), does not solve the indefiniteness issue for the corresponding independent Asserted Claims (or any of the dependent Asserted Claims). This is because the legal principle of claim differentiation dictates that the scope of a dependent claim is more restrictive than the scope of the independent claim from which the dependent claim depends. *See Nazomi Commc'ns, Inc. v. Arm Holdings, PLC.*, 403 F.3d 1364, 1370 (Fed.Cir.2005) ("[C]laim differentiation 'normally means that limitations stated in dependent claims are not to be read into the independent claim from which they depend.'" (quoting *Karlin Tech., Inc. v. Surgical Dynamics, Inc.*, 177 F.3d 968, 971–72 (Fed.Cir.1999))). The relevant Patent Code, 35 U.S.C. § 112,[12] says that dependent claims "shall be construed to incorporate by reference ***all the limitations of the claim to which it refers***." 35 U.S.C. § 112 para. 4 (emphasis added). That is, the dependent claim has all the limitations from the claim(s) from which it depends "and then specif[ies] a further limitation of the subject matter claimed." *Id.* "It is well settled and proper law that '[w]here some claims are broad and other narrow, the narrow claim limitation cannot be read into the broad whether to avoid invalidity or to escape infringement." *Kalman v. Kimberly-Clark Corp.,* 713 F.2d 760, 770 (Fed. Cir. 1984). Simply put, the ppm

---

[12] On September 16, 2011, Congress passed the America Invents Act ("AIA") that, among other things, made § 112 paragraphs (1–6) subsections with lower roman letters (a–f). The Leahy-Smith America Invents Act, Pub. L. No. 112-29, 125 Stat. 284 (2011) (codified in various sections of Title 35 of the United States Code). The AIA took effect on March 16, 2013. AIA §§ 6(f)(2)(A), 3(n)(1). As the '321 Patent was filed on August 16, 2011, pre-AIA, Defendant uses the pre-AIA numbering scheme.

peracetic acid range recited in the unasserted dependent claims (e.g., claim 4) *cannot* be read into the independent Asserted Claims (e.g., claim 1) or the dependent Asserted Claims to cure the indefiniteness. Neither the independent nor dependent Asserted Claims define "antimicrobial" by reciting a specific numerical amount of a solution of peracetic acid (or an amount of peracetic acid) or by reciting a specific numerical reduction in the population of microbes (e.g., by specifying a percent reduction or log reduction)[13]. Ex. D, Dr. Mills Decl., ¶ 25. Enviro Tech could have provided support for such definitions in the specification and then included those definitions for "antimicrobial amount" in the Asserted Claims, but it did not. An analysis of the Asserted Claims therefore demonstrates that "antimicrobial" is indefinite.

## 2.  Meaning Based Upon the Specification of the '321 Patent

The specification of the '321 Patent does not cure the indefiniteness of "antimicrobial amount." Like the Asserted Claims, discussed above, the specification does not define antimicrobial amount by reciting a specific numerical reduction in the population of microbes present (e.g., by specifying a percent reduction or log reduction) required to satisfy "antimicrobial." Ex. D, Dr. Mills Decl., ¶ 27. The specification of the '321 Patent provides the following:

> The water and the PAA solution are combined to form PAA-containing water. An antimicrobial amount of PAA is used. The amount is sufficient to prevent cross-contamination of bacteria between the poultry carcasses and to eradicate or reduce any pathogenic or spoilage microorganisms still resident on the carcasses. The amount of PAA that is used depends on the microbiological condition of the carcasses, but is about 1 ppm to about 99 ppm. Any suitable

Ex. A, '321 Patent, col. 33, lines 29-36. As was discussed with regard to the Asserted Claims, the disclosure in the specification that the "amount of PAA that is used depends on the microbiological

---

[13]    To avoid having to use extremely large numbers when describing the population of microbes present, a log scale is commonly used.

condition of the carcasses, **but is about 1 ppm to about 99 ppm**" does not solve the indefiniteness issue. This numerical limitation is recited in dependent claims (e.g., claim 4) and "cannot be read into the broad whether to avoid invalidity." *Kalman,* 713 F.2d at 770. Moreover, the amount of peracetic acid solution (or peracetic acid) to prevent cross-contamination of bacteria between the poultry carcasses, the amount of peracetic acid solution (or peracetic acid) to eradicate any pathogenic or spoilage microorganisms still resident on the carcasses, and the amount of peracetic acid solution (or peracetic acid) to reduce any pathogenic or spoilage microorganisms still resident on the carcasses are not identical. Ex. D, Dr. Mills Decl., ¶ 29. As the specification discloses, the amount will, at a minimum, depend on the microbiological condition of the carcasses. Additionally, an amount of peracetic acid leading to a measurable but minor reduction in microbial population, such as 1 log10 reduction, may not qualify as an "antimicrobial amount" if the reduction is inconsequential. Ex. D, Dr. Mills Decl., ¶ 29. One of ordinary skill would not consider such a reduction as achieving an "antimicrobial" effect. Ex. D, Dr. Mills Decl., ¶ 29.

The specification contains numerous illustrative examples—24 of them—but none provide an objective basis for determining the scope of "antimicrobial amount" as recited in the Asserted Claims. *See generally* Ex. D, Dr. Mills Decl., ¶ 32-35. Examples 1-14 describe the production of peracetic acid; no poultry carcasses are involved. Ex. D, Dr. Mills Decl., ¶ 32. As such, Examples 1-14 do not address the amount of peracetic acid solution (or peracetic acid) that would be "antimicrobial" in the treatment of poultry carcasses. Ex. D, Dr. Mills Decl., ¶ 32.

Examples 15-17 describe the effects of treating suspensions of *Salmonella* (Examples 15-17) and *E. coli* (Example 15) with peracetic acid but do not involve poultry carcasses. Ex. D, Dr. Mills Decl., ¶ 32. Thus, Example 15-17 do not address the amount of peracetic acid solution (or peracetic acid) required to prevent cross-contamination of bacteria between the poultry carcasses

and to eradicate or reduce any pathogenic or spoilage microorganisms still resident on the carcasses. Ex. D, Dr. Mills Decl., ¶ 32.

Examples 18-19 describe poultry weight gain from peracetic acid treatment under different pH conditions but are silent on the antimicrobial effects of such treatments. Ex. D, Dr. Mills Decl., ¶ 33.

Examples 20 and 21 describe the effects of treating suspensions of *Campylobacter jejuni* with peracetic acid but do not involve poultry carcasses. Ex. D, Dr. Mills Decl., ¶ 33. Thus, Example 20-21 do not address the amount of peracetic acid solution (or peracetic acid) required to prevent cross-contamination of bacteria between the poultry carcasses and to eradicate or reduce any pathogenic or spoilage microorganisms still resident on the carcasses. Ex. D, Dr. Mills Decl., ¶ 33.

Examples 22 and 23 do not reflect real-life conditions at a poultry processor. *Salmonella* inoculum was purposely added to the testing bins. Ex. D, Dr. Mills Decl., ¶ 34. A poultry processor would not purposefully add *Salmonella* to its process. Ex. D, Dr. Mills Decl., ¶ 34. Examples 22 and 23 describe the effects on weight gain by chicken halves when the chicken halves are treated with peracetic acid under different pH conditions. The population of *Salmonella* in the water in the bins, not on the chickens, was determined before and after the chickens were added to the testing bins. Ex. D, Dr. Mills Decl., ¶ 34. While such experiments could possibly be used in an effort to assess the effect of PAA on cross-contamination of *Salmonella* between the poultry carcasses, it fails to do so since no microbial counts were determined for the carcasses, either before or after treatment. Ex. D, Dr. Mills Decl., ¶ 34. Additionally, the example provides no such information for other bacteria. Finally, the example provides no information on the amount of peracetic acid solution (or peracetic acid) to eradicate or reduce any pathogenic or spoilage

microorganisms still resident on the carcasses, as the amount of *Salmonella,* other bacteria, or other pathogenic or spoilage microorganisms on the chicken halves before or after treatment was not evaluated. Ex. D, Dr. Mills Decl., ¶ 34.

Example 24 describes a trial at an actual poultry processor where pH values were raised above values historically used at the plant. The principal purpose of the evaluation was to monitor the effects of pH on weight gain by chicken (the specific part or parts of the chicken is not specified). Ex. D, Dr. Mills Decl., ¶ 35. This Example also does not provide an objective definition for "antimicrobial amount" as the amount of PAA used during the trial is not specified. Ex. D, Dr. Mills Decl., ¶ 35. Even if an amount of PAA used during the trial had been specified, the results of this Example dictate a conclusion that such an amount of PAA would have not been antimicrobial. Despite Enviro Tech's unexplainable assertion that the "antimicrobial efficacy of the PAA was maintained," the actual data demonstrates that the incidence of *Salmonella* during the trial was double the historic average for the plant—"one positive test for *Salmonella* per 51 processed birds" during the trial compared to a historic average of "one positive test for *Salmonella* per 100 processed birds." Ex. D, Dr. Mills Decl., ¶ 35; *compare* Ex. A, '321 Patent, 58:35-36, *with* Ex. A, '321 Patent, 58:62-65.

Any value of the Examples is further limited, as the Examples, even with the described limitations, only relate to three specific bacteria: *Salmonella*, *E. coli*, and *Campylobacter jejuni*. Ex. D, Dr. Mills Decl., ¶ 36. The Examples provide no guidance as to other bacteria or other pathogenic or spoilage microorganisms, which are important considerations in poultry processing technology. Ex. D, Dr. Mills Decl., ¶ 36.

### 3.  Meaning Based Upon the Prosecution History of the '321 Patent

Enviro Tech's statements during the prosecution of the '321 Patent further demonstrate that there is no objective standard for determining the scope of "antimicrobial amount" in the Asserted Claims. In view of statements made in the prosecution history, the use of an amount of peracetic acid solution (or peracetic acid) providing ***any reduction***, even a negligible reduction, in the pathogenic or spoilage microorganisms still resident on the carcasses cannot necessarily be considered to be an "antimicrobial amount." Ex. D, Dr. Mills Decl., ¶ 37. Based on statements made during prosecution, the scope of "antimicrobial amount" must take into account other subjective considerations. As such, one or ordinary skill cannot discern an objective basis for determining the meaning of "antimicrobial amount." Ex. D, Dr. Mills Decl., ¶ 37.

Enviro Tech's arguments that relate to rejections based on two different prior art references are particularly instructive. During prosecution, Enviro Tech made arguments to overcome claim rejections based on U.S. Patent No. 5,632,676 to Kurschner ("Kurschner '676") (Exhibit C1) and claim rejections based on U.S. Patent Publication No. 2009/0324790A1 to Hilgren ("Hilgren '790") (Exhibit C2). In view of these arguments and other statements made by Enviro Tech during the prosecution, one of ordinary skill cannot ascertain an objective standard for determining the meaning and scope of "an antimicrobial amount" "of a solution of peracetic acid" as recited in the Asserted Claims. Ex. D, Dr. Mills Decl., ¶ 37.

### a.  Enviro Tech's prosecution arguments regarding Kurschner '676

During prosecution, the Examiner rejected pending claims reciting a pH range of about 6 to about 9 arguing that the claims were not patentable over Kurschner '676. Ex. B2, Office Action, September 16, 2014. Kurschner '676 discloses that fowl could be "sanitized" by contacting the fowl with solutions of peracetic acid. *See e.g.*, Ex. C1, Kurschner '676, ABSTRACT. Kurschner

'676 provides that "[t]he terms 'sanitize' and 'sanitization' denote a bacterial population *reduction* to a level that is safe for human handling and consumption." Ex. C1, Kurschner '676, 2:10-12. Kurschner '676 provides examples where the fowl were treated at an unmodified pH of around 3 and modified pHs of 5 and 7. Ex. C1, Kurschner '676, Example 5 (pH of 5), Example 6 (pH of 7). Based on the examples, Kurschner '676 includes a Table 2 that provides Effective and Preferred conditions for sanitizing fowl. Ex. C1, Kurschner '676, 9:29-52 (including Table 2). Table 2 provides Effective and Preferred ranges for PAA concentration, hydrogen peroxide concentration, pH, exposure time, and temperature. Ex. C1, Kurschner '676, column 9, Table 2. The Effective and Preferred amounts of PAA substantially overlapped. Ex. D, Dr. Mills Decl., ¶ 39. The Effective amount of PAA was 100-500 ppm, and the Preferred amount of PAA was 100-400 ppm. Ex. C1, Kurschner '676, column 9, Table 2. Effective conditions included a pH range of 3-7, and Preferred conditions included a pH range of 3-5. Ex. C1, Kurschner '676, column 9, Table 2. Kurschner '676's claims recite a method for sanitizing fowl by contacting the fowl with an aqueous peracetic acid solution without adversely affecting the fowl. Ex. C1, Kurschner '676, column 10, claim 1. Claims are included specifically reciting that the method of sanitizing fowl is carried out at a pH of from 3-7, encompassing both the "Effective" and "Preferred" pH ranges. Ex. C1, Kurschner '676, column 10, claims 2, 3, and 6-8.

Despite Kurschner '676's disclosure that both Effective and Preferred conditions were capable of sanitizing fowl, i.e., capable of *reducing* the bacterial population to a level that is safe for human handling and consumption, Enviro Tech attempted to distinguish Kurschner '676. Enviro Tech argued that Kurschner '676 only teaches sanitizing fowl using PAA at its "Preferred" conditions. Ex. D, Dr. Mills Decl., ¶ 40. In particular, Enviro Tech argued that Kurschner '676 only teaches sanitizing fowl using PAA at its Preferred pH range of 3-5 and that Kurschner '676

does not teach one of ordinary skill to use a pH of 5-7, which Kurschner '676 discloses was Effective in sanitizing fowl. Ex. B3, Amendment, December 18, 2014, 7-8 ("[A] person skilled in the art would be taught *away* from raising the pH above 5"); Ex. B4, Declaration of Jonathan N. Howarth, December 18, 2014, 2-4.

Kurschner '676's distinction between Effective conditions and Preferred conditions, including differences in pH range, relates to the avoidance of certain adverse effects, particularly the adverse effects due to the presence of hydrogen peroxide and not to the ability to sanitize the fowl, i.e., the ability to reduce the bacterial population. Ex. D, Dr. Mills Decl., ¶ 41. To argue otherwise would create a nonsensical result where "Effective" to sanitize must be interpreted to mean "Not Effective" to sanitize.

These adverse effects of concern in Kurschner '676 are notably organoleptic effects, such as whitening and change in texture. Ex. D, Dr. Mills Decl., ¶ 41 (citing Ex. C1, Kurschner '676, 2:48-51). The Preferred conditions provided in Table 2 of Kurschner '676 reduce the amount of hydrogen peroxide to which the fowl are exposed and as well as the amount of time the fowl are exposed to hydrogen peroxide. Ex. D, Dr. Mills Decl., ¶ 41. Enviro Tech argued that Kurschner '676 discloses that treatment of fowl with PAA at a pH of from 5-7 resulted in increased bleaching compared to treatment at a pH of around 3. Ex. D, Dr. Mills Decl., ¶ 41. Based on Enviro Tech's arguments regarding Kurschner '676, one of ordinary skill in the art must conclude that the scope of "antimicrobial amount" must account for more than a mere reduction in the population of pathogenic or spoilage microorganisms still resident on the carcasses of the poultry. It must take into account other subjective considerations, notably organoleptic effects, for which no objective criteria are provided in the '321 Patent. Ex. D, Dr. Mills Decl., ¶ 41.

### b. Enviro Tech's prosecution arguments regarding Hilgren '790

Like the prosecution arguments regarding Kurschner '676, Enviro Tech's arguments regarding Hilgren '790 further demonstrate that the scope of "antimicrobial amount" is not an amount providing just ***any reduction***, even a negligible reduction, in the population of pathogenic or spoilage microorganisms still resident on the carcasses of the poultry. During prosecution, the Examiner rejected pending claims based on a combination of prior art that included Hilgren '790. Ex. B11, Office Action, December 29, 2016, 7-12. Responding, Enviro Tech argued that Hilgren '790 teaches that an "'effective amount of antimicrobial agent' means an amount "sufficient to reduce the microbial population in the combined reuse fluid such that the final quality of fluid is safe for its intended use, e.g., as a carcass or bird chiller makeup water …." Ex. B12, Reply to Office Action, February 23, 2017, 9 (citing Exhibit C2, Hilgren '790, [0046]). Enviro Tech argued that while Hilgren '790 evaluated PAA at pHs of 4, 5, 7, 8, and 9, Hilgren '790 found that the PAA "was effective at pHs of 4, 5, and 7, but showed a reduction in efficacy at a pH of 8 and a complete loss of efficacy at a pH of 9." Ex. B12, Reply to Office Action, February 23, 2017, 9 (citing Ex. C2, Hilgren '790, [0106]). Enviro Tech argued that Hilgren '790 only "teaches that the pH should be 4-7." Ex. B12, Reply to Office Action, February 23, 2017, 9 (citing Ex. C2, Hilgren '790, [0106]). However, a review of Figure 5 cited in the relevant paragraph of Hilgren '790 demonstrates that at a pH of 8 the same reduction in the population of microorganisms is achieved as at a pH of 7, merely requiring an additional 30 seconds (2 minutes compared to 2.5 minutes) of treatment to achieve the reduction. Ex. C2, Hilgren '790, [0106], Figure 5. From such facts and argument, one of ordinary skill in the art would conclude that the scope of "antimicrobial amount" is not merely any amount of a solution of peracetic acid providing ***any reduction*** in the number of pathogenic or spoilage microorganisms still resident on the carcasses of the poultry. Ex. D, Dr. Mills Decl., ¶ 42. The scope of "antimicrobial amount" must account for other subjective

considerations, including a subjective opinion of how fast a particular level of reduction must be achieved. Ex. D, Dr. Mills Decl., ¶ 42.

### c.  Other Subjective Considerations

Based on Enviro Tech's prosecution arguments during prosecution of the '321 Patent, one of ordinary skill in the art cannot discern an objective basis for determining the scope of an "antimicrobial amount." The scope is not just any amount of peracetic acid solution (or peracetic acid) that will provide ***any reduction*** in the pathogenic or spoilage microorganisms still resident on the carcasses of the poultry. Ex. D, Dr. Mills Decl., ¶ 43. Other factors, including pH of the treatment solution, hydrogen peroxide concentration, exposure time, temperature, and potential adverse organoleptic effects must be considered. Ex. D, Dr. Mills Decl., ¶ 43. In view of these arguments made by Enviro Tech, one of ordinary skill in the art would conclude that the scope of the term "an antimicrobial amount" "of a solution of peracetic acid" would have varied depending on a multiplicity of interactive and competing factors that different people would prioritize differently. Ex. D, Dr. Mills Decl., ¶ 43; *see also* Ex. C3, U.S. Patent Publication No. 2003/0148727 to Hilgren ("Hilgren '727"), [0119] ("The present methods require a certain minimal contact time of the composition with poultry for occurrence of significant antimicrobial effect. The contact time can vary with concentration of the use composition, method of applying the use composition, temperature of the use composition, amount of soil on the poultry, number of microorganisms on the poultry, or the like."); Ex. C4, U.S. Patent Publication No. 2007/0269563 to Mixon ("Mixon '563"), [0004] ("The ultimate quality of the final product depends not only on the condition of the birds when they arrive at the plant, but also on how the bird is handled during processing."), [0013] ("Organic material in the chiller is primarily determined by the flow rate, flow direction, and the cleanliness of the scalder. The pH, temperature, flow rate, flow direction,

chlorine concentration, and concentration of organic material (digesta, fat, blood) are all factors the pathogen-chiller load."). The intrinsic evidence provides insufficient guidance on these other factors. As such, the scope of "an antimicrobial amount" is subjective and indefinite.

Regarding this multiplicity of subjective interactive and competing factors, the U.S. government did not mandate that a specific minimum amount of reduction in the pathogenic or spoilage microorganisms still resident on the carcasses of poultry be achieved in order for the poultry to be safe for human consumption or eligible to be sold to consumers. Ex. D, Dr. Mills Decl., ¶ 44. Instead, the Food Safety and Inspection Service ("FSIS") instituted regular testing for *Salmonella* and required poultry processors to reduce the frequency of positive samples in their plants. Ex. D, Dr. Mills Decl., ¶ 44. This eventually led to the current classification system with plants classified as 1, 2, or 3. Ex. D, Dr. Mills Decl., ¶ 44. Classification 1 has the lowest incident rate for *Salmonella* among the three classifications; however, a classification of 2 or 3 does not mean that a plant's antimicrobial efforts are unsatisfactory, e.g., that poultry products processed in the plant cannot be sold to consumers or that the plant must be shut down. Ex. D, Dr. Mills Decl., ¶ 44. The classification just affects the amount of testing to which the plant is subjected. Additionally, processing plants with a 3 classification must demonstrate that they are taking action to reassess their Hazard Analysis and Critical Control Points ("HACCP") plan, which, depending on the particular processor, may or may not involve consideration of the amount of peracetic acid or other chemicals being used. Ex. D, Dr. Mills Decl., ¶ 44. Reassessment may involve any number of other factors (including those previously described with respect to Kurschner '676 and Hilgren '790 and those other factors described herein) that might affect the *Salmonella* incident rate. Ex. D, Dr. Mills Decl., ¶ 44. So, at most, the necessary amount of peracetic acid used would have depended upon what FSIS classification a particular processor finds acceptable or what efforts a

particular processor is willing to undertake to achieve a different classification. Ex. D, Dr. Mills Decl., ¶ 44.

In determining what amount of peracetic acid to use, a particular poultry processor will have to take into consideration their subjective tolerance in balancing increased effectiveness in reducing bacteria that might come with increased amounts of peracetic acid against adverse secondary effects that may also occur with increased amounts of peracetic acid, including organoleptic effects such as color, odor, flavor, texture, and tenderness as well as shelf life. Ex. D, Dr. Mills Decl., ¶ 45. Different processors might reach different conclusions in balancing these competing interests. Ex. D, Dr. Mills Decl., ¶ 45.

In determining what amount of peracetic acid to use, a particular poultry processor might take into consideration poultry type and size. Ex. D, Dr. Mills Decl., ¶ 46; *see also* Ex. C5, U.S. Patent No. 6,605,253 to Perkins ("Perkins '253"), 14:30-38 ("The observed range of chiller System water quality varies significantly across the spectrum of poultry processing plants. In some cases, the operation of the chiller system, together with the size, weight and process rate of birds, will allow a solution that may not require the same mass removal of contaminants as others."). A processor might consider using one amount for chicken but might consider using different amounts for turkeys, ducks, goose, or squab. Ex. D, Dr. Mills Decl., ¶ 46; *see also* Ex. A,'321 Patent, 5:18-20 (acknowledging that different residence times might be used for larger birds). A processor might consider different amounts of peracetic acid depending upon whether substantially whole carcasses are being processed or whether smaller portions of the carcass are being processed. Ex. D, Dr. Mills Decl., ¶ 46.

As noted by Enviro Tech in the '321 Patent (Ex. A, '321 Patent, 33:29-36), a poultry processor might take into consideration the microbial conditions of the poultry prior to treatment,

which will likewise depend on a multiplicity of factors, including the source of the poultry. Ex. D, Dr. Mills Decl., ¶ 47. The microbial conditions of poultry from different farms can be expected to vary both in the population of microbes (quantitative difference) and in the type of microbes (qualitative difference). Ex. D, Dr. Mills Decl., ¶ 47; *see also* Ex. C6, PCT Publication No. WO 02/060280 A2 to Swart ("Swart '280"), 18:6-11 ("The present methods require a certain minimal contact time of the composition with food product for occurrence of significant antimicrobial effect. The contact time can vary with concentration of the use composition, method of applying the use composition, temperature of the use composition, amount of soil on the food product, number of microorganisms on the food product, type of antimicrobial agent, or the like."). These differences will in turn vary based on both the conditions at the particular farm as well as the relative difference in the distances between farms and the processing facility. Ex. D, Dr. Mills Decl., ¶ 47. Even for the same farm, microbial conditions may vary based on daily environmental conditions, such as temperature and precipitation. Ex. D, Dr. Mills Decl., ¶ 47. A poultry processor might take into account any one or more of these considerations when deciding what amount of peracetic acid solution (or peracetic acid) to use, and the amount used would vary accordingly among different processors. Ex. D, Dr. Mills Decl., ¶ 47.

A particular poultry processor's intention to use either equilibrium or non-equilibrium peracetic acid might be a consideration. Ex. D, Dr. Mills Decl., ¶ 48. This selection will affect the concentration of hydrogen peroxide present in the treatment system. Ex. D, Dr. Mills Decl., ¶ 48. The concentration of hydrogen peroxide present will, in turn, affect the antimicrobial effectiveness of the treatment fluid as well as the organoleptic properties of the processed poultry. Ex. D, Dr. Mills Decl., ¶ 48; *see also* Ex. C1, Kurschner '676, 1:39-47 ("[E]ach [treatment method] has its own shortcoming, such as altering the color, taste, or texture of the flesh or of the skin. Hydrogen

- 49 -

peroxide, for example, reacts with the enzyme catalase to produce a gas which becomes trapped in the tissue of the fowl, causing the fowl to have a bloated appearance. Moreover, the hydrogen peroxide can adversely affect the skin, either by bleaching it to an objectionable white color or by making it rubbery, or by doing both.), 2:28-40, 2:41-47 ("The peracetic acid, not the hydrogen peroxide, is required for the sanitization process. The hydrogen peroxide is present because of the natural formation of an equilibrium solution with peracetic acid. Because of the equilibrium, the tendency of hydrogen peroxide to adversely affect the poultry at elevated hydrogen peroxide concentrations serves to limit the usable concentrations of peracetic acid."); Ex. C7, U.S. Patent No. 6,627,657 to Hilgren ("Hilgren '657"), 2:43-49 ("A composition of the invention is directed to reducing the concentration of hydrogen peroxide relative to a peroxycarboxylic acid from conventional concentrations to a level described herein. Reducing the hydrogen peroxide concentration relative to peroxycarboxylic acid provides a degree of antimicrobial properties that is surprising and unique in this technology."). The choice of equilibrium or non-equilibrium peracetic acid will also affect the predominant species of peracetic acid present in the treatment system. Ex. D, Dr. Mills Decl., ¶ 48. Over the ranges of pH claimed in the '321 Patent, peracetic acid will predominantly exist as the peroxyacetate ion. Ex. D, Dr. Mills Decl., ¶ 48; *see also* Ex. B4, Declaration of Jonathan N. Howarth, December 18, 2014, 3-4 ("At about a pH 6.6, as the pH increases, the percent of the acid species decreases in a nearly linear fashion, until, at pH 8.2, the peracetic acid solution is only 50% as the undissociated (acid) species. At pH 10, the peracetic acid solution is almost 100% as the dissociated (ionized) species."). The peroxyacetate ion is a less effective antimicrobial than peracetic acid. Ex. D, Dr. Mills Decl., ¶ 48. Moreover, the amount of peroxyacetate ion present will be different for solutions of equilibrium peracetic acid and non-equilibrium peracetic acid. Ex. D, Dr. Mills Decl., ¶ 48.

Similarly, a particular poultry processor might take into consideration the percentage of peracetic acid in the peracetic acid solution, which would have affected the concentration of hydrogen peroxide present, which would affect the antimicrobial effectiveness of the treatment fluid, but which, as previously described, can also affect the organoleptic properties of the processed poultry. Ex. D, Dr. Mills Decl., ¶ 49.

In determining what amount of peracetic acid to use, a particular poultry processor might take into consideration unique features of the processing plant. The amount of peracetic acid a processor might select may vary with the size and number of chillers used and the dwell or soak time chosen by the processor, which may vary based on other factors, such as the type and size of the poultry being processed, as previously described. Ex. D, Dr. Mills Decl., ¶ 50. The amount of peracetic acid used may vary based on the rate at which the processor elects to add and remove the poultry from the chiller. Ex. D, Dr. Mills Decl., ¶ 50; *see also* Ex. C1, Kurschner '676 1:16-27. A processor may vary the amount of peracetic acid used based on whether the fluid in the chiller is agitated, how it is agitated, and the extent to which it is agitated. Ex. D, Dr. Mills Decl., ¶ 50; *see also* Ex. C3, Hilgren '727, [0124] ("The washing solution is preferably agitated to increase the efficacy of the solution and the speed in which the solution reduces micro-organisms accompanying to the poultry product. Agitation can be obtained by conventional methods, including ultrasonics, aeration by bubbling air through the solution, by mechanical methods, such as strainers, paddles, brushes, pump driven liquid jets, or by combinations of these methods. The washing solution can be heated to increase the efficacy of the solution in killing micro-organisms."); Ex. C8, U.S. Patent Publication No. 2011/0274766 to Allen ("Allen '766"), [0026]; Ex. C6, Swart '280, 19:14-16; Ex. C9, U.S. Patent Publication No, 2007/0292580 A1 to Gutzmann ("Gutzmann '580"), [0079]. A processor might take into consideration the temperature of the

treatment fluid in the chiller. Ex. D, Dr. Mills Decl., ¶ 50; *see also* Ex. C2, Hilgren '790, [0005] ("The effective amount of antimicrobial agent is based on a plurality of food processing parameters including, … the temperature of the used food processing fluid."); Ex. C10, PCT Patent Publication No. WO 01/05255 to Marsden ("Marsden '255"), 8:10-14 ("The optimal concentration depends on the length of time to which the food products are exposed to the decontaminant solution and on the temperature of the decontaminant solution."); Ex. C6, Swart '280, 18:6-12 ("The contact time can vary with concentration of the use composition, method of applying the use composition, temperature of the use composition, amount of soil on the food product, number of microorganisms on the food product, type of antimicrobial agent, or the like."). A processor might vary the amount of peracetic acid used based on the location in the process where the peracetic acid was added. For example, if a processing line had multiple chillers, in which chiller or chillers does the processor add the peracetic acid? Ex. D, Dr. Mills Decl., ¶ 50. A processor might vary the amount of peracetic acid used based on how much treatment fluid is bled off from the process, how frequently the treatment fluid is bled off, and whether this treatment fluid is discarded as waste or reused, and, if reused, where and how it is injected into the process and whether additional disinfecting agent is added. Ex. D, Dr. Mills Decl., ¶ 50; *see also* Ex. C2, Hilgren '790, [0003] – [0005]; Ex. C3, Hilgren '727, [0003] ("Water used for washing or these other procedures is often used repeatedly over time, which provides yet another opportunity spreading, rather than reducing, microbial burden on poultry. For example, the water becomes contaminated with organic matter and microbes from the poultry, and the organic matter provides nutrients for microbial growth in the water over time or through additional use. These microbes can grow on and contaminate additional poultry and processing equipment. In particular, water left untreated in a submersion bath tends to decontaminate poultry early in a shift but contaminates

poultry later in the shift."), [0132] – [0134]; Ex. C8, Allen '766, [0004] ("Poultry is typically washed at any of several steps during the process of converting a live bird to an edible food product. Decontamination is more difficult because many types of bacteria are able to adhere within only 15 seconds of contact and a significant number of carcasses can become cross-contaminated with pathogens during handling, scalding, mechanical processing, and chilling. Water used for washing or other procedures is often used repeatedly over time, which provides yet another opportunity spreading, rather than reducing, microbial burden on poultry."), [0027]-[0029].

Because the claims of the '321 Patent also require the altering of pH to a range of alkaline pHs, varying by as much as a pH of about 7.6 to a pH of about 10, the amount of peracetic acid a poultry processor might use may vary over the range of pH. Ex. D, Dr. Mills Decl., ¶ 51; *see also* Ex. C5, Perkins '253, 7:21-23 (The temperature and pH level of the water into which the disinfection agent … is introduced can dramatically affect the effectiveness of the disinfection agent."). The form in which the peracetic acid exists over the claimed pH ranges will be different. Accordingly, the effectiveness of peracetic acid at a particular amount over the recited pH ranges will vary. The amount of hydroxide ions will also differ tremendously in a treatment solution at a pH of 10 compared to a similar treatment fluid at a pH of 7.6. Ex. D, Dr. Mills Decl., ¶ 51; *see also* Ex. B7 ,Declaration of Jonathan N. Howarth, July 10, 2015, ¶4 ("A peracetic acid solution at pH 7.6 contains $3.98 \times 10^{-7}$ mol/L of hydroxide ions, while the same solution at pH 7.0 contains $1 \times 10^{-7}$ mol/L of hydroxide ions. Thus, a solution of peracetic acid at pH 7.6 contains 3.98, or about 4, times more hydroxide ions than the same solution at pH 7.0."), ¶4 ("A solution of peracetic acid at pH 8.0 contains 10 times more hydroxide ions than the same solution at pH 7.0."); Ex. B6, Amendment, July 10, 2015, 16-17 (citing Howarth Declaration, and stating that "a peracetic acid

solution of at pH 7.6 contains almost four times more hydroxide ions than the same solution at pH 7.0. [This increase] "would require the addition of a significant amount of alkaline source, such as sodium hydroxide, in order to increase the hydroxide ion concentration by a factor of 4."); Ex. B9, Reply to Office Action, January 15, 2016, 7 ("any adjustment of the pH … would require significant changes in chemistry"), 9; Ex. B10, Declaration of Sacit F. Bilgili, January 13, 2016, ¶6 (changes in pH are "a dramatic change to the chemistry of the chill tank"). The presence of the hydroxide ions will impact the stability of the peracetic acid and the availability of the peracetic acid to act as a decontaminant. Thus, the amount of peracetic acid any particular poultry processor might use can be expected to vary. Ex. D, Dr. Mills Decl., ¶ 51.

A person of ordinary skill in the art would have understood that the amount of PAA effective to decontaminate or sanitize poultry was so widely dependent upon so many various conditions that a poultry processor could not know before treating carcasses whether the patent claims would be infringed or not. Ex. D, Dr. Mills Decl., ¶ 52; *see also* Ex. C1, Kurschner '676, 1:60-62, 2: 22-27 (teaching concentration from 100 to 2000 ppm to sanitize poultry).

The claims, specification, and prosecution history of the '321 Patent provide no objective standard by which one of ordinary skill in the art can determine the meaning and scope of "an antimicrobial amount" "of a solution of peracetic acid" as recited in the Asserted Claims. Ex. D, Dr. Mills Decl., ¶ 52. Neither the independent claims nor the dependent Asserted Claims define antimicrobial amount by reciting a specific amount of peracetic acid or a specific numerical reduction in the population of microbes present (e.g., by specifying a percent reduction or log reduction). The selection of any particular amount of a peracetic acid solution (or peracetic acid) requires the consideration of so many dependent, interacting, variable, and subjective factors that one of ordinary skill in the art could not determine the scope of "an antimicrobial amount." A

poultry processor could not reasonably ascertain whether they were infringing or not. Ex. D, Dr. Mills Decl., ¶ 52. Accordingly, the term "an antimicrobial amount" is indefinite.

## VI.    CONCLUSION

For the foregoing reasons, Safe Foods respectfully requests that the Court enter an Order adopting its proposed constructions, which are repeated here for convenience.

| Term | Defendant's Proposed Construction | Plaintiff's Proposed Construction |
|---|---|---|
| "determining the pH" | measuring the pH | Plain and Ordinary Meaning |
| altering the pH of the peracetic acid-containing water | raising the pH of the peracetic acid-containing water from the outside to the inside of the claimed range | Plain and ordinary meaning: changing the pH of the peracetic acid-containing water |
| "after the step of…[b], [c], [d], [e]" | The "after the step of" limitations require the steps of the claims to be performed in the order recited | Plain and ordinary meaning: subsequent to |
| "about" (with reference to pH) | Indefinite | Plain and ordinary meaning: approximately |
| "antimicrobial amount" | Indefinite | Plain and ordinary meaning: an amount sufficient to eradicate or reduce microorganisms |

Dated: April 4, 2022

Respectfully submitted,

Scott W. Clark (pro hac vice)
Brian E. Simmons (pro hac vice)
Attorneys for Defendant Safe Foods Corp.
AHMAD, ZAVITSANOS, & MENSING P.C.
1221 McKinney Street, Suite 2500
Houston, TX 77010
Telephone: (713) 655-1101
Facsimile: (713) 655-0062
Email:    sclark@azalaw.com
             bsimmons@azalaw.com

Jess L. Askew, III, Ark. Bar No. 86005
jess.askew@kutakrock.com
Frederick H. Davis, Ark. Bar No. 2012271
frederick.davis@kutakrock.com
Attorneys for Defendant Safe Foods Corp.
KUTAK ROCK LLP
124 West Capitol Avenue, Suite 2000
Little Rock, AR 72201
Telephone: (501) 975-3000
Facsimile: (501) 975-3001
Email:    jess.askew@kutakrock.com
             frederick.davis@kutakrock.com

**ATTORNEYS FOR DEFENDANT
SAFE FOODS CORPORATION**