**EXHIBIT D**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

| | | |
|---|---|---|
| ENVIRO TECH CHEMICAL SERVICES, INC., | § § § | |
| *Plaintiff,* | § § | |
| | § | Civil Action No. 4:21-cv-000601-BRW |
| v. | § § | Jury Trial Demanded |
| SAFE FOODS CORPORATION, | § § | |
| *Defendant.* | § § | |

### DECLARATION OF EDWARD W. MILLS, PH.D.

I, Edward W. Mills, Ph. D., make this declaration in connection with the Opening Claim Construction Brief of Defendant Safe Foods Corporation ("Safe Foods" or "Defendant") submitted in the above-captioned case ("the Action"). All statements made herein of my own knowledge are true, and all statements made herein based on information and belief are believed to be true. Although I am being compensated for my time in preparing this declaration, the opinions stated herein are my own, and I have no stake in the outcome of the Action or any related proceedings.

## I.    INTRODUCTION

1.    I am more than eighteen years of age, and I am a citizen of the United States, currently residing in Pennsylvania.

2.    I have been retained by counsel for Defendant to provide my opinions as to the construction of certain terms in the claims of U.S. Patent No. 10,912,321 ("the '321 Patent" or "the Asserted Patent"), currently asserted by Plaintiff Enviro Tech Chemical Services, Inc. ("Enviro Tech" or "Plaintiff") in the Action. Based on my analysis and investigation, I have reached certain conclusions and developed certain opinions on the issues that I discuss in this declaration.

3.      This declaration is based on information currently available to me. I understand that discovery in the Action is still ongoing, and I reserve the right to expand or modify my opinions as my investigation and study continues. I may also supplement my opinions in response to any additional information that becomes available to me, including any matters raised by Enviro Tech, and/or any opinions provided by Enviro Tech and/or opinions provided by any Enviro Tech expert, or in light of any relevant orders from the Court.

4.      For the purposes of preparing this declaration, I have reviewed the Asserted Patent and its prosecution history.

5.      In forming my opinions, I have considered the documents listed, and my knowledge and experience based upon my work in this area.

6.      It is my understanding that Enviro Tech has asserted infringement of claims 1-3, 5-12, 14-19, 21-24, 26-29, and 31-33 ("the Asserted Claims") of the '321 Patent.

7.      As explained in more detail below, it is my opinion that the term "antimicrobial amount," used in the claims with reference to a solution of peracetic acid,[1] when read in light of the specification and the prosecution history of the '321 Patent, fails to inform with reasonable certainty those of ordinary skill in the art about the scope of the claim in which the term appears. Therefore, it is my understanding that this term is indefinite. It is also my opinion that to accurately determine the pH of a real solution, including solutions (or systems) at varying temperatures that may contain poultry carcasses, the pH needs to be physically measured. Common methods for measuring pH include glass electrodes, indicator solutions, and pH test strips.

---

[1] Throughout this declaration, I may refer to "peracetic acid" and "PAA" interchangeably.

## II.    QUALIFICATIONS AND COMPENSATION

8.    I am currently Associate Professor of Meat Science at Pennsylvania State University.

9.    I received a Bachelor of Science degree in Animal Science from the Ohio State University in 1977. I received a Master of Science degree in Meat Science from the Ohio State University in 1979. I received a Ph.D. in Meat Science from Purdue University in 1984.

10.    I have worked in the field of food science, with experience in meat and poultry processing, for 38 years. My current teaching responsibility includes instruction of students in proper techniques for processing, chilling, cut-up and deboning of poultry and other species. I have extensive knowledge and experience in the area of antimicrobial treatment of food products. A copy of my CV is provided as Exhibit 1.[2] Based on my experience, including as provided herein and in my CV, I am qualified to provide the opinions contained herein with respect to the Asserted Patent.

11.    I am being compensated for my time at an hourly rate of $150.00. My compensation is not dependent on the substance of my statements in this Declaration or the outcome of the Action.

## III.    RELEVANT LEGAL STANDARDS

12.    I am not an attorney. However, I have been informed by counsel of the legal standards that apply with respect to claim construction and indefiniteness, and have used those standards in formulating my opinions. I have set forth these standards below as I understand them.

---

[2] Exhibit 1 is provided with my declaration. References to other alphanumeric Exhibits (e.g., Exhibits A, B1, C1) refer to exhibits to the Opening Claim Construction Brief of Defendant Safe Foods Corporation.

13.    I understand that the claims of a patent define the limits of the patentees' exclusive rights. In order to determine the scope of the claimed invention, courts typically construe (or define) claim terms, the meaning of which the parties may dispute. I understand that claim terms should generally be given their ordinary and customary meaning as understood by one of ordinary skill in the art at the time of filing of the patent applications, after reading the patent and its prosecution history.

14.    Specifically, I understand that claims must be construed in light of, and consistent with, the patent's intrinsic evidence. Intrinsic evidence includes the claims themselves, the written disclosure in the specification, and the patent's prosecution history, including the prior art that was considered by the United States Patent and Trademark Office. I understand that extrinsic evidence may also be considered when construing claims and may include, for example, technical dictionaries, technical publications, treatises, prior art, and expert testimony.

15.    I understand that a claim limitation is indefinite if the claim, when read in light of the specification and the prosecution history, fails to inform with reasonable certainty a person of ordinary skill in the art about the scope of the claim limitation and therefore, the scope of the claim.

## IV.    LEVEL OF SKILL IN THE ART

16.    I understand that the factors that may be considered in determining the level of ordinary skill in the art include, but are not limited to, (1) the educational level of the inventor, (2) the type of problems encountered in the art, (3) prior art solutions to those problems, (4) the rapidity with which innovations are made, (5) the sophistication of the technology, and (6) the educational level of active workers in the field.

17.    Taking these factors into account, a person of ordinary skill in the art in the technology pertaining to the Asserted Patent at the time of the alleged invention(s) would have

included a technologist with at least 3-5 years of educational and/or industry experience in the areas of animal, meat, and/or food science. In some cases a greater degree of education could compensate for a lesser degree of work experience. Similarly, in some cases a greater degree of work experience could compensate for a lesser degree of education.

18.    My opinions below apply this definition for a person of ordinary skill in the art.

## V.    CLAIM CONSTRUCTION

### A.    "antimicrobial amount"

19.    I understand that the parties have offered the following proposed constructions:

| Defendant's Proposed Construction | Plaintiff's Proposed Construction |
|---|---|
| Indefinite | Plain and ordinary meaning: an amount sufficient to eradicate or reduce microorganisms |

### 1.    Disclosure of the Asserted Claims of the '321 Patent

20.    The term "antimicrobial amount" appears in all of the independent claims of the '321 Patent, claims 1 ,10, 19, 24, 29, each of which is an Asserted Claim. The term "antimicrobial amount" is also expressly recited in the following dependent Asserted Claims of the '321 Patent: claims 2, 3, 11, and 12. It is my understand, however, that the issue of indefiniteness for this term is relevant to all of the dependent Asserted Claims.

21.    In each instance, "antimicrobial amount" is used in reference to an amount of a "solution of peracetic acid" in a recited "method of treating at least a portion of a poultry carcass." While there are differences in the independent claims, the claim element in which "antimicrobial amount" is found is identical in each of the independent claims. Claim 1 of the '321 Patent is provided below as an example:

> 1. A method of treating at least a portion of a poultry carcass with peracetic acid, said method comprising the steps of:
>
> providing, in a reservoir, a peracetic acid-containing water, wherein the peracetic acid-containing water comprises water and an antimicrobial amount of a solution of peracetic acid;
>
> after the step of providing the peracetic acid-containing water,. determining the pH of the peracetic acid-containing water, and altering the pH of the peracetic acid-containing water to a pH of about 7.6 to about 10 by adding an alkaline source;
>
> after the step of determining the pH and altering the pH of the peracetic acid-containing water, placing into the peracetic acid-containing water at least a portion of a poultry carcass;
>
> after the step of placing at least the portion of the poultry carcass into the peracetic acid-containing water, determining the pH of the peracetic acid-containing water in the reservoir with at least the portion of the poultry carcass therein, and altering the pH of the peracetic acid-containing water to a pH of about 7.6 to about 10 by adding an alkaline source; and
>
> after the step of determining the pH and altering the pH of the peracetic acid-containing water having at least the portion of the poultry carcass therein, removing at least the portion of the poultry carcass from the peracetic acid-containing water.

Exhibit A, '321 Patent, column 61, lines 31-58.

22.    I have been informed that a patent claim is invalid for indefiniteness if it fails to inform one of ordinary skill in the art, with reasonable certainly, about the scope of the alleged invention. Based on that understanding, "antimicrobial amount," as used in the relevant claims of the '321 Patent, is indefinite, and the claims reciting "antimicrobial amount" are indefinite. There is no way for one of ordinary skill in the art to reasonably discern the meaning of "antimicrobial amount."

23.    A person of ordinary skill in the art cannot reasonably ascertain the meaning of "antimicrobial amount" "of a solution of peracetic acid" from the claim language itself. The plain language of the Asserted Claims does not provide any objective indication as to what amounts of a "solution of peracetic acid" qualify as an "antimicrobial amount."

6

24.     As an initial matter, the Asserted Claims do not recite "an antimicrobial amount of peracetic acid." The Asserted Claims recite "an antimicrobial amount *of a solution* of peracetic acid," but the amount of peracetic acid provided in a solution of peracetic acid will vary depending on a multiplicity of factors. At a minimum, the amount of peracetic acid in the solution will vary depending on the concentration of peracetic acid in the solution. A 10% peracetic acid solution will provide a different amount of peracetic acid than a 5% peracetic acid solution when the solutions are used in the same volume. Moreover, a "solution of peracetic acid," depending upon various factors, including the method of preparation and the conditions of use, such as pH and temperature, will contain peracetic acid as well as varying amounts of other compounds, including reactants, such as hydrogen peroxide, used to produce the peracetic acid and compounds, such as the peracetate ion, into which peracetic acid dissociates. All of these variables will affect the efficacy of the solution of peracetic acid. The amount of any particular antimicrobial species is not provided by the recitation of an "antimicrobial amount *of a solution* of peracetic acid." For this reason alone, the plain language of the Asserted Claims does not inform with reasonable certainty a person of ordinary skill in the art about the scope of the recited "antimicrobial amount *of a solution* of peracetic acid." The plain language of the claims also does not inform with reasonable certainty a person of ordinary skill in the art about the scope of the unrecited "antimicrobial amount of peracetic acid."

25.     Neither the independent claims nor the dependent Asserted Claims recite a specific numerical amount of a solution of peracetic acid (or an amount of peracetic acid) required to be "antimicrobial." Neither the independent claims nor the dependent Asserted Claims define antimicrobial amount by reciting a specific numerical reduction in the population of microbes (e.g., by specifying a percent reduction or log reduction) required to satisfy "antimicrobial."

26.     The recitation of a specific range of concentration of peracetic acid of from about 1 ppm to about 99 ppm in unasserted dependent claims (e.g., claim 4) does not solve this issue with respect to the independent Asserted Claims and other dependent Asserted Claims, as I have been informed that the scope of a dependent claim is more restrictive than the scope of the independent claim from which the dependent claim depends.

### 2.     Disclosure of the Specification and Prosecution History of the '321 Patent

#### a.     The Specification of the '321 Patent

27.     The specification and prosecution history of the '321 Patent do not clarify this issue. Like the claims, the specification of the '321 Patent does not define antimicrobial amount by reciting a specific numerical reduction in the population of microbes present (e.g., by specifying a percent reduction or log reduction) required to satisfy "antimicrobial."

28.     The specification of the '321 Patent provides the following:

> The water and the PAA solution are combined to form PAA-containing water. An antimicrobial amount of PAA is used. The amount is sufficient to prevent cross-contamination of bacteria between the poultry carcasses and to eradicate or reduce any pathogenic or spoilage microorganisms still resident on the carcasses. The amount of PAA that is used depends on the microbiological condition of the carcasses, but is about 1 ppm to about 99 ppm. Any suitable

Exhibit A, '321 Patent, column 33, lines 29-36.

29.     The amount of peracetic acid solution (or peracetic acid) to prevent cross-contamination of bacteria between the poultry carcasses, the amount of peracetic acid solution (or peracetic acid) to eradicate any pathogenic or spoilage microorganisms still resident on the carcasses, and the amount of peracetic acid solution (or peracetic acid) to reduce any pathogenic or spoilage microorganisms still resident on the carcasses are not identical. As the specification discloses, the amount will, at a minimum, depend on the microbiological condition of the

carcasses. Moreover, an amount of peracetic acid leading to a measurable but minor reduction in microbial population, such as 1 log10 reduction, may not qualify as an "antimicrobial amount" if the reduction is inconsequential, as in a reduction from 10^6 to 10^5 cfu/cm^2. One of ordinary skill would not consider such a reduction as achieving an "antimicrobial" effect.

30.     These statements in the specification, particularly when considered in the context of the prosecution history, do not provide to one of ordinary skill in the art an objective indication as to the meaning of "antimicrobial amount."

31.     As an initial matter, and as previously described, it is my understanding that the disclosure in the specification that the "amount of PAA that is used depends on the microbiological condition of the carcasses, ***but is about 1 ppm to about 99 ppm***" cannot provide an objective understanding of "antimicrobial amount" as recited in the independent claim because this numerical limitation is recited in dependent claims (e.g., claim 4) and I have been informed that scope of the dependent claims is more restrictive than the scope of the corresponding independent claim.

32.     The examples in the specifications likewise do not provide guidance as to the full scope of the term "antimicrobial amount." Examples 1-14 relate to methods for producing peracetic acid and do not address the amount of peracetic acid solution (or peracetic acid) that would be "antimicrobial" in the treatment of poultry carcasses. Examples 15-17 describe the effects of treating suspensions of *Salmonella* (Examples 15-17) and *E. coli* (Example 15) with peracetic acid but do not involve poultry carcasses and thus, necessarily, provide no guidance on the amount of peracetic acid solution (or peracetic acid) required to prevent cross-contamination of bacteria between the poultry carcasses and to eradicate or reduce any pathogenic or spoilage microorganisms still resident on the carcasses.

33.     Examples 18-19 describe the effects on weight gain by poultry carcasses when the carcasses are treated with peracetic acid under different pH conditions, but these examples do not address the antimicrobial effects of such treatments. Examples 20 and 21 describe the effects of treating suspensions of *Campylobacter jejuni* with peracetic acid but do not involve poultry carcasses and thus, necessarily, provide no guidance on the amount of peracetic acid solution (or peracetic acid) required to prevent cross-contamination of bacteria between the poultry carcasses and to eradicate or reduce any pathogenic or spoilage microorganisms still resident on the carcasses.

34.     Examples 22 and 23 describe the effects on weight gain by chicken halves when the chicken halves are treated with peracetic acid under different pH conditions. *Salmonella* inoculum was added to the testing bins and the population of *Salmonella* was determined. The chicken halves were then added. Subsequently, the water in the bins was sampled and the population of *Salmonella* in the water was determined. As an initial matter, this does not represent real-life conditions, as a poultry processor is not going to proactively add *Salmonella* to its process. Moreover, while such experiments could possibly be used in an effort to assess the effect of PAA on cross-contamination of *Salmonella* between the poultry carcasses, it fails to do so since no microbial counts were determined for the carcasses, either before or after treatment. Additionally, the example provides no such information for other bacteria. Finally, the example provides no information on the amount of peracetic acid solution (or peracetic acid) to eradicate or reduce any pathogenic or spoilage microorganisms still resident on the carcasses, as the amount of *Salmonella,* other bacteria, or other pathogenic or spoilage microorganisms on the chicken halves before or after treatment was not evaluated.

10

35.    Example 24 describes an evaluation at a poultry processor where the effects on weight gain by chicken (the specific part or parts of the chicken is not specified) when the chicken are treated with peracetic acid under different pH conditions. The processor's historic 2-year average incidence of *Salmonella* was one positive test for *Salmonella* per 100 processed birds. During a 13 day trial where the pH was elevated, the average incidence of *Salmonella* **increased**, averaging one positive test for *Salmonella* per 51 processed birds. Rather than reducing the incidence of *Salmonella*, the treatment at the higher pH resulted in a near doubling of the incidence in *Salmonella*.[3] Moreover, the example provides no information about the amount of peracetic acid solution (or peracetic acid) employed during the 13 day trial and thus provides no information on the scope of "antimicrobial amount."

36.    As a final comment on the examples, to the extent any information is provided by the examples, the information is limited to the three specific bacteria identified in the Examples: *Salmonella*, *E. coli*, and *Campylobacter jejuni*. The Examples provide no guidance as to other bacteria or other pathogenic or spoilage microorganisms, which are important considerations in poultry processing technology.

### b.    The Prosecution History of the '321 Patent

37.    Additionally, in view of statements made in the prosecution history, the use of an amount of peracetic acid solution (or peracetic acid) providing ***any reduction***, even a negligible reduction, in the pathogenic or spoilage microorganisms still resident on the carcasses cannot necessarily be considered to be an "antimicrobial amount." Based on statements made during prosecution, the scope of "antimicrobial amount" must take into account other subjective

---

[3] It is noted that despite the clear indication from this data to the contrary, Enviro Tech stated that "the antimicrobial efficacy was maintained" during the trial. Exhibit A, '321 Patent, column 58, lines 62-63.

considerations. As such, one of ordinary skill cannot discern an objective basis for determining the meaning of "antimicrobial amount."

38.    During the prosecution history of the '321 Patent, Enviro Tech made arguments to overcome claim rejections based on U.S. Patent No. 5,632,676 to Kurschner ("Kurschner '676") (Exhibit C1) and claim rejections based on U.S. Patent Publication No. 2009/0324790A1 to Hilgren ("Hilgren '790") (Exhibit C2). In view of these arguments and other statements made by Enviro Tech during the prosecution of the '321 Patent, one of ordinary skill in the art cannot ascertain an objective standard for determining the meaning and scope of "an antimicrobial amount" "of a solution of peracetic acid" as recited in the Asserted Claims.

### (1)    U.S. Patent No. 5,632,676 to Kurschner

39.    During prosecution, the Examiner rejected pending claims reciting a pH range of about 6 to about 9 arguing that the claims were not patentable over Kurschner '676. Exhibit B2, Office Action, September 16, 2014. Kurschner '676 discloses that fowl could be "sanitized" by contacting the fowl with solutions of peracetic acid. *See e.g.,* Exhibit C1, Kurschner '676, ABSTRACT. Kurschner '676 provides that "[t]he terms 'sanitize' and 'sanitization' denote a bacterial population **reduction** to a level that is safe for human handling and consumption." Exhibit C1, Kurschner '676, column 2, lines 10-12. Kurschner '676 provides examples where the fowl were treated at an unmodified pH of around 3 and modified pHs of 5 and 7. Exhibit C1, Kurschner '676, Example 5 (pH of 5), Example 6 (pH of 7). Based on the examples, Kurschner '676 includes a Table 2 that provides Effective and Preferred conditions for sanitizing fowl. Exhibit C1, Kurschner '676, column 9, lines 29-52 (including Table 2). Table 2 provides Effective and Preferred ranges for PAA concentration, hydrogen peroxide concentration, pH, exposure time, and temperature. Exhibit C1, Kurschner '676, column 9, Table 2. The Effective and Preferred amounts

of PAA substantially overlapped. The Effective amount of PAA was 100-500 ppm, and the Preferred amount of PAA was 100-400 ppm. Exhibit C1, Kurschner '676, column 9, Table 2. Effective conditions included a pH range of 3-7, and Preferred conditions included a pH range of 3-5. Exhibit C1, Kurschner '676, column 9, Table 2. Kurschner '676's claims recite a method for sanitizing fowl by contacting the fowl with an aqueous peracetic acid solution without adversely affecting the fowl. Exhibit C1, Kurschner '676, column 10, claim 1. Claims are included specifically reciting that the method of sanitizing fowl is carried out at a pH of from 3-7, encompassing both the "Effective" and "Preferred" pH ranges. Exhibit C1, Kurschner '676, column 10, claims 2, 3, and 6-8.

40.    Despite Kurschner '676's disclosure that both Effective and Preferred conditions were capable of sanitizing fowl, i.e., capable of *reducing* the bacterial population to a level that is safe for human handling and consumption, Enviro Tech attempted to distinguish Kurschner '676, arguing that Kurschner '676 only teaches sanitizing fowl using PAA at its "Preferred" conditions. In particular, Enviro Tech argued that Kurschner '676 only teaches sanitizing fowl using PAA at its Preferred pH range of 3-5 and that Kurschner '676 does not teach one of ordinary skill to use a pH of 5-7, which Kurschner '676 discloses was Effective in sanitizing fowl. Exhibit B3, Amendment, December 18, 2014, 7-8 ("[A] person skilled in the art would be taught *away* from raising the pH above 5"); Exhibit B4, Declaration of Jonathan N. Howarth, December 18, 2014, 2-4.

41.    Kurschner '676's distinction between Effective conditions and Preferred conditions, including differences in pH range, does not relate to ability to sanitize the fowl – the ability to reduce the bacterial population. It relates to the avoidance of certain adverse effects, particularly the adverse effects due to the presence of hydrogen peroxide. Exhibit C1, Kurschner

'676, column 2, lines 41-65. These adverse effects are notably organoleptic effects, such as whitening and change in texture. Exhibit C1, Kurschner '676, column 2, lines 48-51. Thus, the Preferred conditions provided in Table 2 reduce the amount of hydrogen peroxide to which the fowl are exposed and as well as the amount of time the fowl are exposed to hydrogen peroxide. Enviro Tech argued that Kurschner '676 discloses that treatment of fowl with PAA at a pH of from 5-7 resulted in increased bleaching compared to treatment at a pH of around 3.[4] Exhibit B3, Amendment, December 18, 2014, 7-8 ("[A] person skilled in the art would be taught *away* from raising the pH above 5"); Exhibit B4, Declaration of Jonathan N. Howarth, December 18, 2014, 2-4. Based on the Enviro Tech's arguments regarding Kurschner '676, one of ordinary skill in the art must conclude that the scope of "antimicrobial amount" must account for more than a mere reduction in the population of pathogenic or spoilage microorganisms still resident on the carcasses of the poultry. It must take into account other effects, notably organoleptic effects, for which no objective criteria are provided in the '321 Patent.

### (2)    U.S. Patent Publication No. 2009/0324790A1 to Hilgren

42.    Enviro Tech's arguments during prosecution related to Hilgren '790 further demonstrate that the scope of "antimicrobial amount" must take into account more than just any reduction in the population of pathogenic or spoilage microorganisms still resident on the carcasses of the poultry. During prosecution, the Examiner rejected pending claims based on a combination of prior art that included Hilgren '790. Exhibit B11, Office Action, December 29, 2016. In responding to the rejection, Enviro Tech argued that Hilgren '790 teaches that an "'effective amount of antimicrobial agent' means an amount "sufficient to reduce the microbial population in

---

[4] While I do not necessarily agree with the Enviro Tech's conclusions regarding the Examples in Kurschner '676, I have accepted their arguments for the purposes of this analysis.

the combined reuse fluid such that the final quality of fluid is safe for its intended use, e.g., as a carcass or bird chiller makeup water …." Exhibit B12, Reply to Office Action, February 23, 2017, 9 (citing Exhibit C2, Hilgren '790, [0046]). Enviro Tech argued that while Hilgren evaluated PAA at pHs of 4, 5, 7, 8, and 9, Hilgren found that the PAA "was effective at pHs of 4, 5, and 7, but showed a reduction in efficacy at a pH of 8 and a complete loss of efficacy at a pH of 9." Exhibit B12, Reply to Office Action, February 23, 2017, 9 (citing Exhibit C2, Hilgren '790, [0106]). Enviro Tech argued that Hilgren '790 only "teaches that the pH should be 4-7." Exhibit B12, Reply to Office Action, February 23, 2017, 9 (citing Exhibit C2, Hilgren '790, [0106]). However, a review of Figure 5 cited in the relevant paragraph of Hilgren '790 demonstrates that at a pH of 8 the same reduction in the population of microorganisms is achieved as at a pH of 7, merely requiring an additional 30 seconds (2 minutes compared to 2.5 minutes) of treatment to achieve the reduction. Exhibit C2, Hilgren '790, [0106], Figure 5. Thus, an "antimicrobial amount," according to the Enviro Tech, depends not merely upon using an amount of a solution of peracetic acid sufficient to achieve ***any reduction*** in the number of pathogenic or spoilage microorganisms still resident on the carcasses of the poultry but also on other subjective considerations, including a subjective opinion of how fast a particular level of reduction must be achieved.

### (3)    Consideration of other factors

43.    Based on Enviro Tech's arguments during prosecution of the '321 Patent, one of ordinary skill in the art cannot determine the scope of an "antimicrobial amount." One of ordinary skill in the art would conclude that "an antimicrobial amount" "of a solution of peracetic acid" must take into account more than just the amount of peracetic acid solution (or peracetic acid) that will provide ***any reduction*** in the pathogenic or spoilage microorganisms still resident on the carcasses of the poultry but must also take into account other factors, including pH of the treatment

solution, hydrogen peroxide concentration, exposure time, temperature, and potential adverse organoleptic effects. In view of these arguments made by Enviro Tech, one of ordinary skill in the art would conclude that the scope of the term "an antimicrobial amount" "of a solution of peracetic acid" would have varied depending on a multiplicity of interactive and competing factors that different people would prioritize differently. As such, the scope of "an antimicrobial amount" is subjective and indefinite.

44. As disclosed above, one of ordinary skill in the art would recognize that "an antimicrobial amount of a solution of peracetic acid" would have varied depending on a multiplicity of subjective interactive and competing factors. For instance, the U.S. government did not mandate that a specific minimum amount of reduction in the pathogenic or spoilage microorganisms still resident on the carcasses of poultry be achieved in order for the poultry to be safe for human consumption or eligible to be sold to consumers. Instead, the Food Safety and Inspection Service ("FSIS") instituted regular testing for *Salmonella* and required poultry processors to reduce the frequency of positive samples in their plants. This eventually led to the current classification system with plants classified as 1, 2, or 3. Classification 1 has the lowest incident rate for *Salmonella* among the three classifications; however, a classification of 2 or 3 does not mean that a plant's antimicrobial efforts are unsatisfactory, e.g., that poultry products processed in the plant cannot be sold to consumers or that the plant must be shut down. The classification just affects the amount of testing to which the plant is subjected. Additionally, processing plants with a 3 classification must demonstrate that they are taking action to reassess their Hazard Analysis and Critical Control Points ("HACCP") plan. Depending on the particular processor, such reassessment might consider the amount of peracetic acid or other chemicals being used but might alternatively or additionally consider any one or more of other numerous factors

(including those described below) that might affect the *Salmonella* incident rate. So, at most, the necessary amount of peracetic acid used would have depended upon what FSIS classification a particular processor finds acceptable or what efforts a particular processor is willing to undertake to achieve a different classification.

45.     In determining what amount of peracetic acid to use, a particular poultry processor will have to take into consideration their subjective tolerance in balancing increased effectiveness in reducing bacteria that might come with increased amounts of peracetic acid against adverse secondary effects that may also occur with increased amounts of peracetic acid, including organoleptic effects such as color, odor, flavor, texture, and tenderness. Similarly, shelf life of the poultry product may vary with the level of peracetic acid. Different processors might reach different conclusions in balancing these competing interests.

46.     In determining what amount of peracetic acid to use, a particular poultry processor might take into consideration the type of poultry and the size of poultry. For example, a processor might consider using one amount for chicken but might consider using different amounts for turkeys, ducks, goose, or squab. A processor might consider different amounts of peracetic acid depending upon whether substantially whole carcasses are being processed or whether smaller portions of the carcass are being processed.

47.     In determining what amount of peracetic acid to use, a particular poultry processor might take into consideration the microbial conditions of the poultry prior to treatment. Such microbial conditions will depend on a multiplicity of factors, including the source of the poultry. The microbial conditions of poultry from different sources (i.e., different farms) can be expected to vary both in the population of microbes (quantitative difference) and in the type of microbes (qualitative difference). Such differences will vary not only based on the conditions at the

particular farm but also the relative difference in the distances between farms and the processing facility. Even when considering poultry from the same farm, microbial conditions can be expected to vary based on environmental conditions, such as temperature and precipitation, existing on the day the poultry are transported to the processing facility. A poultry processor might take into account any one or more of these considerations when deciding what amount of peracetic acid solution (or peracetic acid) to use, and the amount used would vary accordingly among different processors.

48.    In determining what amount of peracetic acid to use, a particular poultry processor might take into consideration whether equilibrium or non-equilibrium peracetic acid is being used. The choice of equilibrium or non-equilibrium peracetic acid will affect the concentration of hydrogen peroxide present in the treatment system. The concentration of hydrogen peroxide present will, in turn, affect the antimicrobial effectiveness of the treatment fluid as well as the organoleptic properties of the processed poultry. The choice of equilibrium or non-equilibrium peracetic acid will also affect the predominant species of peracetic acid present in the treatment system. Over the ranges of pH claimed in the '321 Patent, peracetic acid will predominantly exist as the peroxyacetate ion. The peroxyacetate ion is a less effective antimicrobial than peracetic acid. Moreover, the amount of peroxyacetate ion present will be different for solutions of equilibrium peracetic acid and non-equilibrium peracetic acid.

49.    Similarly, a particular poultry processor might take into consideration the percentage of peracetic acid in the peracetic acid solution, which would have affected the concentration of hydrogen peroxide present, which would affect the antimicrobial effectiveness of the treatment fluid, but which, as previously described, can also affect the organoleptic properties of the processed poultry.

50.     In determining what amount of peracetic acid to use, a particular poultry processor might take into consideration unique features of the processing plant. The amount of peracetic acid a processor might select may vary with the size and number of chillers used and the dwell or soak time chosen by the processor, which may vary based on other factors, such as the type and size of the poultry being processed, as previously described. The amount of peracetic acid used may vary based on the rate at which the processor elects to add and remove the poultry from the chiller. A processor may vary the amount of peracetic acid used based on whether the fluid in the chiller is agitated, how it is agitated, and the extent to which it is agitated. A processor might take into consideration the temperature of the treatment fluid in the chiller. A processor might vary the amount of peracetic acid used based on the location in the process where the peracetic acid was added. For example, if a processing line had multiple chillers, in which chiller or chillers does the processor add the peracetic acid? A processor might vary the amount of peracetic acid used based on how much treatment fluid is bled off from the process, how frequently the treatment fluid is bled off, and whether this treatment fluid is discarded as waste or reused, and, if reused, where and how it is injected into the process and whether additional disinfecting agent is added.

51.     Because the claims of the '321 Patent also require the altering of pH to a range of alkaline pHs, varying by as much as a pH of about 7.6 to a pH of about 10, the amount of peracetic acid a poultry processor might use may vary over the range of pH. The form in which the peracetic acid exists over the claimed pH ranges will be different. Accordingly, the effectiveness of peracetic acid at a particular amount over the recited pH ranges will vary. The amount of hydroxide ions present will also differ tremendously in a treatment fluid at a pH of 10 compared to a similar treatment fluid at a pH of 7.6. The presence of the hydroxide ions will impact the stability of the

peracetic acid and the availability of the peracetic acid to act as a decontaminant. Thus, the amount of peracetic acid any particular poultry processor might use can be expected to vary.

52.    The claims, specification, and prosecution history of the '321 Patent provide no objective standard by which one of ordinary skill in the art can determine the meaning and scope of "an antimicrobial amount" "of a solution of peracetic acid" as recited in the Asserted Claims. Neither the independent claims nor the dependent Asserted Claims define antimicrobial amount by reciting a specific amount of peracetic acid or a specific numerical reduction in the population of microbes present (e.g., by specifying a percent reduction or log reduction). The selection of any particular amount of a peracetic acid solution (or peracetic acid) requires the consideration of so many dependent, interacting, variable, and subjective factors that one of ordinary skill in the art could not determine the scope of "an antimicrobial amount." A poultry processor could not reasonably ascertain whether they were infringing or not.

**B.    "determining the pH of the peracetic acid-containing water" or "determining the pH"**

53.    I understand that the parties have offered the following proposed constructions:

| Defendant's Construction | Plaintiff's Construction |
|---|---|
| measuring the pH | Plain and ordinary meaning: determining the pH of the peracetic acid-containing water by any method |

54.    The pH of a solution is a measure of the acidity or alkalinity of the solution (i.e., whether it is acidic or basic). The pH scale is logarithmic and inversely indicates the concentration of hydrogen ions (H+) in a solution. pH is defined as: $-\log[H+]$ where $[H+]$ is the concentration of hydrogen ions in a solution. Generally, a pH of 7 is considered neutral (e.g., pure water and fluid in most living things), a pH below 7 is considered acidic and indicates a higher concentration of hydrogen ions, and a pH above 7 is considered alkaline (basic).

55.    However, this theoretical description of pH and acidity is highly simplified, as actual measured pH depends on a specific set of conditions. For example, standard pH values are typically reported for solutions at a temperature of 25°C. However, pH changes inversely with temperature. So, at a higher temperature, the pH would be lower. As another example, the pH of fluids in animal tissues is influenced by dissolved solutes including minerals and proteins, among others. The living body has a variety of systems for maintaining pH at the correct level for life functions. The pH of common "tap" water is also influenced by dissolved solutes and ranges widely from acidic to basic depending on the water source and variations in that source.

56.    In theory, the pH of a solution containing a known amount of acid or base material and a known amount of pure water can be calculated simply from knowing the amount of water and the amount of acid or base being added to the water. However, such a calculation would only produce a result as accurate as the measurements of the initial quantities and would be divorced from other environmental factors such as temperature, varying pH of the actual water supply, and any other components that may be present in the solution or added to the solution over time. In other words, the result of the calculation is what the pH should be theoretically, under idealized conditions, and not an actual measurement of the solution's pH that accounts for real-world conditions. The pH of a solution could deviate from its theoretical, calculated value for a number of reasons, including temperature deviations, measurement variability in the amounts of water and acid/base, impurities present in the water or acid/base, or additions to the solution of other components (such as poultry carcasses). Thus, to accurately determine the pH of a real solution, including solutions (or systems) at varying temperatures that may contain poultry carcasses, the pH needs to be physically measured. Common methods for measuring pH include glass electrodes, indicator solutions, and pH test strips.

I declare under penalty of perjury that the foregoing is true and correct.


_____    4/2/2022
Edward W. Mills, Ph. D                        Date

Declaration of Edward W. Mills, Ph.D.


EXHIBIT 1

VITA

EDWARD WILLIAM MILLS

**EDUCATION**:

| DEGREE | AREA | INSTITUTION | DATE | THESIS TOPIC |
|--------|------|-------------|------|--------------|
| B. S. with Distinction | Animal Science | Ohio State University | March 1977 | Chill Cooler Condensation |
| M.S. | Meat Science | Ohio State University | June 1979 | Ham Processing |
| Ph.D. | Meat Science | Purdue University | August 1984 | Connective Tissue |

**EXPERIENCE**:

**Associate Professor of Meat Science**
> Food Science - courtesy appointment, Member of Intercollege Graduate Program in Nutrition, Meat Laboratory Faculty Coordinator
> Pennsylvania State University                                     Current

> Responsibilities:  Teaching undergraduate meat science, meat processing, curing, smoking, food safety and animal physiology. Research in areas of meat processing and meat technology with emphasis on meat packaging, UV light as antimicrobial treatment for exposed and packaged foods, control of lipid oxidation and alternative meat curing systems.  Responsible for supervision of Penn State's Meat Laboratory (a USDA inspected livestock slaughter and processing facility). Respond to meat industry and livestock producer inquiries regarding meat processing, quality and safety. Advise undergraduate and graduate students.

**Assistant Professor of Dairy and Animal Science,** Pennsylvania State University        1988-1994
> Responsibilities:  Teach meat science courses, supervise Meat Laboratory, meat processing research.

**Technical Services Manager,**  Wilson Food Corporation                              1987-1988
> Responsibilities:  Cured, smoked and luncheon meat process control, product testing, product development scale-up testing, food safety assurance, processing equipment design, spice mixing operations, government liaison for full line pork processor manufacturing smoked meats, sausage products and ready-to-eat meats. Assisted with installation and start-up of million pound per week continuous frankfurter manufacturing operation.

**Assistant Professor of Food Science,**  Purdue University                          1984-1987
> Responsibilities:  Meat processing and meat product extension education programs, problem solving for meat processors, teaching meat processing principles and technology.

**Foreign Countries Visited, and Purpose of Visit**
> Germany, 1985, 2 month study visit, meat processing techniques, smoke production and composition.
> Denmark, 1990, 1 week, scientific meeting, utilization of intact male pigs for meat production.
> Brazil, 2000, 1 week, invited lectures on ham manufacturing, smoking and cooking procedures.
> Namibia, 2006, 2 weeks, invited presentations, USAID community development site visit.
> China, 2007, 2 weeks, invited lectures, delegation to establish cooperation with Food Science Departments.
> Kenya, 2009, 3 weeks, investigate prospects value added food processing for economic development
> Africa, 2012, 2 weeks, Ministry of Agriculture meetings and meat plant visits in South Africa and Ethiopia.

PUBLICATIONS - TEXTBOOK:
> Aberle, E.D., J.C. Forrest, D.E. Gerrard and **E.W. Mills**. 2012. Principles of Meat Science, Fifth Edition. Kendal/Hunt Publishing Co. Dubuque, Iowa. 395 pages.

AWARDS:
> Distinguished Teaching Award, American Meat Science Association, 2010.

**SELECTED PUBLICATIONS - RESEARCH:**

> Cassar, J. R., Bright, L. M., Patterson, P. H., Mills, E. W., Demirci, A. 2021. The Efficacy of Pulsed Ultraviolet Light Processing for Table and Hatching Eggs. Poultry Science. doi:10.1016/j.psj.2020.12.021.

> C.M. Poholsky**,** E.W. Mills, and J.W. Boney. 2020. A method for characterizing instrumental quality measurements of turkey breast meat. Poult. Sci. Vol. 99 (E-Suppl. 1): 65.

Cassar, J.R., E.W. Mills and A. Demirci. 2020. Comparison of pulsed ultraviolet light systems for microbial reduction of chicken thighs. Poster presentation at National Poultry Products Exposition, Atlanta GA.

Cassar, J.R., E.W. Mills, J.A. Campbell and A. Demirci. 2019. Decontamination of chicken thigh meat by pulsed ultraviolet light. Meat and Muscle Biology 3(1):1-9 doi:10.22175/mmb2019.08.0033.

Cassar, J.R., E.W. Mills, J.A. Campbell and A. Demirci. 2018. Pulsed UV light as a microbial reduction intervention for boneless/skinless chicken thigh meat. Proceedings of Reciprocal Meat Conference 69:1070.

Arteaga, I.S.A., J.A. Campbell, J.R. Cassar and E.W. Mills. 2017. Oxygen Scavengers Affect Gas Mixture and Color Stability of Master Packed Ground Beef, Meat and Muscle Biology 1(1):181-191.

Stufft, K., J. Elgin, B. Patterson, S.K. Matarnek, R. Preisser, H. Shi, E.M. England, T.L. Scheffler, E.W. Mills and D.E. Gerrard. 2017. Muscle characteristics only partially explain color variations in fresh hams. Meat Science 128:88-96. DOI: 10.1016/j.meatsci.2016.12.012

Arteaga, I.S.A. and E.W. Mills. 2015. Oxygen scavengers affect color and gas concentrations of master packed ground beef.  Meat Science 101:111.

Harvison, K. and E.W. Mills. 2015. Modified atmosphere packaging affects ground beef patty cohesiveness. Meat Science 101:113-114.

Gipe, A.N., E.W. Mills, C.R. Raines, K.B. Kephart, C.N. Cutter. 2012. Inhibition of Foodborne Pathogens in "No-Nitrate or Nitrite-Added" Bacon Brine Formulations, International Congress of Meat Science and Technology. Abstract #186. Montreal, Canada.

Gipe, A.N., E.W. Mills, C.R. Raines, K.B. Kephart, C.N. Cutter. 2012. Investigation of quality attributes of no-nitrate or nitrite-added bacon. Proceedings of Reciprocal Meat Conference 65:58-59, (abstract number 28).

Yoder, S.F., W.R. Henning, E.W. Mills, S. Doores, N. Ostiguy and C.N. Cutter. 2012. Investigation of chemical rinses suitable for very small meat plants to reduce pathogens on beef surfaces. J. Food Prot. 75(1)14-21.

Yoder, S.F., W.R. Henning, E.W. Mills, S. Doores, N. Ostiguy, and C.N. Cutter. 2010. Investigation of water washes suitable for very small meat plants to reduce pathogens on beef surfaces. J. Food Prot. 73:907-915.

Steinberg, E.L., J.W. Comerford, V.H. Baumer and E.W. Mills. 2009. Production and consumer characteristics of pasture-fed beef. Prof. Anim. Sci.   25:443-448.

Mills, E.W. 2009. Meat Product Safety. J. Anim. Sci. Vol. 87, E-Suppl. 2/J. Dairy Sci. Vol. 92, E-Suppl. 1:537.

Valderrama, W.B., E.W. Mills, and C.N. Cutter. 2009. Efficacy of chlorine dioxide against *Listeria monocytogenes* in brine solutions. J. Food Prot. 72: accepted June 19, 2009.

Mills, E.W. 2007. Aging Beef for Tenderness and Flavor. How much is enough? Proceedings from the National Grass-fed Beef Conference. Grantville, PA. pp. 290-294.

Yoder, S.F., E.W. Mills, W.R. Henning, N. Ostiguy, S. Doores, C.N. Cutter. 2007. The efficacy of microbiological diluents for the recovery of foodborne pathogens associated with homogenized beef tissue. Institute of Food Technologists. Abstract Number: 098-11.

Mills, E.W. , K. Seetharaman, A.N. Maretzki .2007. A NutriBusiness strategy for processing and marketing animal-source foods for children.  J. Nutr. 137:1115-1118.

Maretzki, A.N., K. Seetharaman and E.W. Mills. 2005. A NutriBusiness Strategy for Empowering Rural Women and Improving Children's Health. South African J. of Clinical Nutrition. Vol. 18, Suppl. 1:11.  Abstract presented at 18th International Congress of Nutrition, "Food-based Approaches to Combating Micro-Nutrient Deficiencies in Children of Developing Countries", Durban South, Africa.

Joyce, B.C., A.M Geiger, C.N. Cutter and E.W. Mills. 2004. Microbial counts on overhead surfaces and in condensate in pork carcass coolers. Presented at Institute of Food Technologists Annual Meeting, Las Vegas, NV.

Britton, R. M., Mills, E. W., Henning, W. R., and Cutter, C. N. 2004. Application of post-packaging heat treatments to reduce *Listeria monocytogenes* on ready-to-eat meat products produced by very small meat establishments. Institute of Food Technologists Annual Meeting, Las Vegas, NV, July 12-16, 2004. (Poster#22714 )

Chang, V.P., E.W. Mills and C.N. Cutter. 2003. Reduction of bacteria on pork carcasses associated with chilling method. J. of Food Protection. Vol. 66:1019-1024.

Kieras, S.J., E.W. Mills, S.J. Knabel and A.N. Maretzki. 2002. Validation of pathogen destruction during manufacture of a meat-based potato snack (Chiparoo). J. of Food Proc. and Pres. Vol. 26(6):385-399.

Kieras, S.J., A.N. Maretzki, S.J. Knabel and E.W. Mills. 2002. Safety assessment and sensory analysis of a meat-based dried snack food. Conference proceedings: Animal Source Foods and Nutrition in Developing Countries. Global Livestock Collaborative Research and Support Program. Poster presentation.

Maretzki, A.N., E.W. Mills. 2002. Applying the nutribusiness concept to increase animal source food consumption in local communities. Conference proceedings: Animal Source Foods and Nutrition in Developing Countries. Global Livestock Collaborative Research and Support Program. Invited presentation.

Chikthimmah, N., R.C. Anantheswaran, R.F. Roberts, E.W. Mills and S.J. Knabel. 2001. Influenece of sodium chloride on growth of lactic acid bacteria and subsequent destruction of escherichia coli O157:H7 during Lebanon bologna processing. J. Food Protection, Vol 64: 1145-1150.

Chang, V.P., E.W. Mills and C.N. Cutter. 2001. Comparison of recovery methods for freeze-injured Listeria monocytogenes, salmonella typhimurium and campylobacter coli associated with cell surfaces and pork surfaces. Proceedings of Reciprocal Meat Conference 54:368.

Valente, L.M., K.E. Oskin, P.N. Walker, C.N. Cutter and E.W. Mills. 2000. Near Infrared Spectroscopy for Assessing Microbial Counts and Shelf Life of Beef. Proceedings of Reciprocal Meat Conference. Vol. 53:137.

Oskin, K.E., E.W. Mills, P.N. Walker. 1999. Near infrared spectroscopy for predicting meat quality parameters. Proceedings of Reciprocal Meat Conference. Vol. 52:122.

Henning, W.R., E.W. Mills, J. Grim and B.L. Coe. 1998. Improving the quality and consistency of veal. National Veal Quality Audit. National Cattlemen's Beef Association and American Veal Association.

Ellajosyula, K.R., S. Doores, E.W. Mills, R.A. Wilson, R.C. Anantheswaran and S.J. Knabel. 1998. Destruction of Echerichia coli O157:H7 and salmonella typhimurium in lebanon bologna by interaction of fermentation pH, heating temperature and time. J. Food Protection 61(2):152-157.